**APL CORPORATION, a corporation authorized to do business in the State of New Jersey and its subsidiary, Imperial Packaging Corp., a corporation**

v.

**AETNA CASUALTY & SURETY COMPANY.**

Civ. No. K–78–1865.

United States District Court, D. Maryland.

April 25, 1980.

Donald C. Allen, Allen, Thieblot & Alexander, Baltimore, Md., and Stephen Greiner, Willkie, Farr & Gallagher, New York City, for plaintiffs.

James E. Gray, Vaughan K. Weikel and Semmes, Bowen & Semmes, Baltimore, Md., for defendant.

FRANK A. KAUFMAN, District Judge.

Plaintiffs, APL and one of its subsidiaries (hereinafter collectively referred to as APL) seek payment by defendant (Aetna) of $836,310 alleged by APL to be payable by Aetna under a policy of insurance issued by Aetna insuring APL against, *inter alia*, acts of dishonesty by employees of APL. Plaintiffs state their claims in two counts: (1) Plaintiffs have made sufficient proof of loss, and defendant has failed to pay as required; (2) Defendant, in so failing, has acted in bad faith.

APL alleges that several of its employees stole merchandise belonging to APL, sold that merchandise for cash, and retained the proceeds for themselves. As a result of the investigations by the Baltimore City police of APL's alleged loss, two of plaintiffs' employees were prosecuted and pled guilty to charges of larceny after trust. The results of those police investigations also apparently indicate that at least two other APL employees may have been involved, but they have not been prosecuted. The police reports, compiled following the police investigations, also indicate that the theft-and-resale scheme involved merchandise amounting to approximately $7,000 in value.

In support of their claim under the insurance policy, plaintiffs submitted the following to defendant:

(1) A printed "Proof of Loss" on a form supplied by defendant.

(2) Documents reflecting the results of the investigations conducted by plaintiffs' security personnel, police and prosecutors, claiming a loss of approximately $7,000.

(3) A document entitled "Imperial Packaging Corporation Calculation of Inventory Shortage," claiming a shortage in plaintiffs' inventories of merchandise valued in excess of $800,000.

Section 2 of the insurance policy issued by defendant provides that the policy does not apply:

. . . to loss, or to that part of any loss, as the case may be, the proof of which either as to its factual existence or as to its amount is dependent upon an inventory calculation.

Defendant has taken and continues to take the position, in denying plaintiffs' claim for indemnification, that so much of plaintiffs' loss as exceeds the $7,000 amount uncovered by the police and security personnel is provable only through an inventory computation and, thus, is excluded from coverage under Section 2 of the insurance policy.

Defendant apparently conducted an investigation of plaintiffs' loss which included interviews with plaintiffs' employees and with merchants who had made cash purchases from such employees. On November 14, 1979, plaintiffs noticed the deposition of Michael R. Coyne, defendant's senior claims examiner in charge of investigating plaintiffs' claim. In connection with said deposition, plaintiffs issued a subpoena duces tecum, directing Coyne to produce at his deposition:

all documents in its possession constituting, referring to, reflecting or supporting the investigation, adjustment and/or determination by Aetna, its employees, agents or representatives of the claim by Plaintiffs for insurance compensation for losses arising out of the employee dishonesty which is the subject of this action.

On November 27, 1979, Coyne appeared for his deposition. In response to plaintiffs' inquiries, Coyne identified certain documents which he and other of defendant's employees had prepared in the course of defendant's investigation of plaintiffs' claim. *Tr.*, at pp. 15, 18, 22, 31, 34, 36, 38, 39, 57, 59. Such documents include refer-

ences to meetings and telephone conversations with employees of plaintiffs, merchants who had made purchases from those employees, and other persons with knowledge of occurrences relating to plaintiffs' claims. Defendant has refused to produce those documents, contending that those documents were prepared by defendant in anticipation of litigation and are thus exempt from discovery. However, further questioning by plaintiffs' counsel elicited from Coyne repeated denials that such documents were prepared in anticipation of litigation. *Tr.*, at pp. 17, 20, 24–25, 35, 37, 57, 59–61.

Coyne also testified that defendant maintains a manual setting forth defendant's procedures for investigating and adjusting indemnity claims, *Tr.*, at pp. 5–6, 45–46, and that such manual includes a statement of Aetna's interpretation of the exclusionary clause upon which Aetna relies. Aetna has, up to this time, refused to produce the manual.

In their Motion to Compel Discovery, plaintiffs seek to require defendant to produce:

(a) documents relating to defendant's investigation and rejection of plaintiffs' claim, and

(b) manuals which set forth defendant's investigative procedures with respect to fidelity bond claims.

■ Federal Civil Rule 26(b)(3), as amended in 1970, provides in relevant part:

(3) *Trial Preparation: Materials.* Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule *and prepared in anticipation of litigation* or for trial by or for another party or by or for that other party's representative (including his attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the par-

ty seeking discovery has *substantial need* of the materials in the preparation of his case and that he is unable *without undue hardship* to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impressions, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation. (Emphasis added.)

The documents sought by plaintiffs would appear to be "relevant to the subject matter involved in the pending action"[1] and would thus seem to be "otherwise discoverable" under Rule 26(b)(1). Defendant seemingly so concedes. Accordingly, defendant's only basis for objecting to plaintiffs' document requests would appear to be that the documents in question were "prepared in anticipation of litigation" and that plaintiffs have not met their burden of showing "substantial need" and "undue hardship" in securing equivalent material. For reasons set forth *infra*, this Court concludes that the investigative documents plaintiffs seek to discover were not "prepared in anticipation of litigation" and accordingly must be produced by defendant.

■ However, even if the documents in question were "prepared in anticipation of litigation," the materials would still be discoverable, subject to certain limitations discussed *infra*, because, in this Court's view, plaintiffs have met the burden of showing that they have "substantial need" for those documents and that they would incur "undue hardship" in securing by other means substantially equivalent materials. Count 2 of plaintiffs' complaint alleges that Aetna acted in bad faith in denying so much of plaintiffs' claim as exceeds the $7,000 amount uncovered by the police. If plaintiffs are able to prove that defendant, when

---

1. Federal Civil Rule 26(b)(1) provides, in relevant part:

**(b) Scope of Discovery.** Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

(1) *In General.* Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, * * *

it denied plaintiffs' claim, was aware of facts showing that the extent of the thefts by plaintiffs' employees was far greater than such employees have been willing to admit to the police or to plaintiffs, a factfinder might be able properly to infer that such refusal to pay was made in bad faith. Cf. *Atlanta Coca-Cola Bottling Co. v. Transamerica Ins. Co.*, 61 F.R.D. 115, 117 (N.D.Ga.1972). While plaintiffs could conduct their own interviews of the people in question, and might learn what they have previously stated to Aetna, it is not unlikely that the documents from Aetna's files reflecting its investigation of plaintiffs' claim will themselves be capable of establishing in the most effective way what information Aetna had in its possession when Aetna decided to deny plaintiffs' claim. Thus, as to plaintiffs' claim of bad faith, the documents in question may constitute quite important evidence as to whether Aetna conducted a diligent investigation of plaintiffs' claim and whether Aetna acted in good faith in denying the claim. It follows that defendant would not be entitled to withhold *in toto* the investigative documents plain-

tiffs seek, even if those documents were, as this Court concludes they were not, "prepared in anticipation of litigation." But it is also true that if those investigative documents had been "prepared in anticipation of trial," then, even though plaintiffs have borne their burden of establishing "substantial need" and "undue hardship," Rule 26(b)(3) would entitle defendant not to disclose "the mental impressions, conclusions, opinions, or legal theories of [its] attorney *or other representative * * *.*" (Emphasis added.) [2]

■ In addition to defendant's investigative file, plaintiffs also seek production of those sections of defendant's claims investigation manual which concern defendant's interpretation of the inventory exclusion clause in plaintiffs' policy upon which defendant relies in denying plaintiffs' claim. Those portions of Aetna's manual which set forth defendant's general procedure for investigating and settling fidelity bond claims are "relevant to the subject matter involved in the pending action * * *." F.R.C.P.

---

2. In discussing the inviolability of an attorney's opinion work product, Judge Widener wrote, in language equally applicable to the opinion work product of a non-attorney:

> * * * In our view, no showing of relevance, substantial need or undue hardship should justify compelled disclosure of an attorney's mental impressions, conclusions, opinions or legal theories. *This is made clear by the Rule's use of the term "shall" as opposed to "may."*

*Duplan Corp. v. Moulinage et Retorderie de Chavanoz*, 509 F.2d 730, 734 (4th Cir. 1974), cert. denied, 420 U.S. 997, 95 S.Ct. 1438, 43 L.Ed.2d 680 (1975).

Thus, if the documents in question had been prepared in anticipation of litigation, plaintiffs would not be entitled to have defendant produce such portion of defendant's files as relate to the mental impressions, conclusions, opinions, or legal theories of defendant's attorneys or any of its representatives. Under those conditions it would be necessary for this Court to spell out a procedure to protect against disclosure of such opinion work-product. See *Duplan, supra,* 509 F.2d at 736–37, at which Judge Widener concluded:

> On remand, the district court may, providing the other prerequisites for discovery have been met, excise from such documents the mental impressions, conclusions, opinions, or legal theories of an attorney or other repre-

sentative, and order the balance of the documents to be produced. See Note of the Advisory Committee, etc., 48 F.R.D. 457, 502; 8 Federal Practice and Procedure, Civil, Wright and Miller (1970), pp. 231–2. The district court also may require [the party from whom discovery is sought] to abstract such documents for turning over to [the party seeking discovery], or may itself abstract the documents, in either case taking care to protect against disclosure of mental impressions, conclusions, opinion, or legal theories as directed by the last sentence of F.R.C.P. 26(b)(3).

To the same effect, *see* 4 Moore's Federal Practice, ¶ 26.64 (1978–79 Supp.) at 74.

In this case, it would appear that, in any event, plaintiffs' purpose in seeking discovery of the files in question is not to become privy to Coyne's mental impressions or legal theories, but rather to discern what *facts* were in defendant's possession when defendant denied plaintiffs' claim. Accordingly, if the investigative documents in question herein had been "prepared in anticipation of litigation," this Court would have excised from them all references to the mental impressions, conclusions, opinions or legal theories of defendant's representatives and would have ordered only the balance of said documents to be produced.

26(b)(1).[3] That is true despite defendant's contention that that manual constitutes confidential, proprietary material which should not be ordered produced. (Memorandum of Defendant in Opposition, at 11–12). However, the confidentiality of defendant's Claims Manual can be preserved if the relevant portions are produced subject to the terms of an appropriate protective order.[4] Accordingly, those portions of defendant's claims manual dealing with defendant's investigative procedures with respect to fidelity bond claims are hereby ordered to be produced, subject to an appropriate protective order submitted by the parties and signed by this Court.

■ As indicated *supra*, the key to the discovery dispute involving the investigative documents is whether those documents were "prepared in anticipation of litigation." The work product protections of Federal Civil Rule 26(b)(3) extend only to those "documents or tangible things * * prepared in anticipation of litigation or for trial * * *." *See* the Advisory Committee Notes to the 1970 Amendments to the Federal Rules which state: "Materials assembled in the ordinary course of business, * * * or for other nonlitigation purposes are not under the qualified immunity provided by [Rule 26(b)(3)]. * * *" 48 F.R.D. 487, 501 (1970).

■ The qualified work product immunity of Rule 26(b)(3) extends to material prepared before litigation commences, provided that "some possibility of litigation" exists. *See In re Grand Jury Investigation,* 599 F.2d 1224, 1229 (3rd Cir. 1979), in which Chief Judge Seitz, in discussing the "work product" doctrine, commented:

> * * * Courts and commentators have offered a variety of formulas for the necessary nexus between the creation of the material and the prospect of litigation. *See, e. g., Home Insurance Co. v. Ballenger Corp.,* 74 F.R.D. 93, 101 (N.D.Ga.1977) (must be a "substantial probability that

litigation will occur and that commencement of such litigation is imminent"); *In re Grand Jury Investigation (Sturgis), supra,* at 948 (threat of litigation must be "real and imminent"); *Stix Products, Inc. v. United Merchants & Manufacturers, Inc.,* 47 F.R.D. 334, 337 (S.D.N.Y.1969) (prospect of litigation must be "identifiable"); 4 Moore's Federal Practice ¶ 26.-63[2.–1], at 26–349 (1970) (litigation must "reasonably have been anticipated or apprehended"). Professors Miller and Wright offer an attractive formulation based on the purpose of the work-product doctrine itself:

> > Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained *because of* the prospect of litigation.

> 8 Wright & Miller, Federal Practice and Procedure: Civil § 2024, at 198 (1970) (emphasis added; footnote omitted).

Professors Wright and Miller further comment:

> But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.

8 Wright & Miller, Federal Practice and Procedure, § 2024, at 198–99 (1970) (footnote omitted).

■) Under the 1970 amendment to Rule 26, work product protection applies not only to documents prepared by an attorney in anticipation of litigation, but also to documents prepared "by or for a representative of a party, including his agent." 8 Wright & Miller, Federal Practice and Procedure, § 2024, at 206. Nevertheless, several courts have held that while documents prepared

---

3. See note 1, *supra*.

4. The parties in this case have already agreed to a Stipulation and Order ensuring confiden-

tiality of certain financial documents of plaintiffs which were produced at the request of defendant. *See* Doc. 34 in Court File.

16

by a non-attorney can be deemed to have been prepared "in anticipation of litigation," they can only be so deemed if they were authored after consultation with an attorney. In *Thomas Organ Co. v. Jadranska Slobodna Plovidba*, 54 F.R.D. 367, 372 (N.D.Ill.1972), for example, Judge Will concluded:

> * * * [By 1970], the trend of the federal decisions had settled in the direction of requiring the production of reports made by parties and their agents in the regular course of business, i. e., not in conjunction with or for an attorney (thus indicating that such reports were not considered to be work-product), * * *. This trend which was followed in the framing of Rule 26(b)(3) compels the Court to conclude that *any* report or statement made by or to a party's agent (other than to an attorney acting in the role of counsellor), which has not been requested by nor prepared for an attorney nor which otherwise reflects the employment of an attorney's legal expertise must be conclusively presumed to have been made in the ordinary course of business and thus not within the purview of the limited privilege of new Rule 26(b)(3) and (b)(4). (emphasis in original).

That language from *Thomas Organ* was quoted in part by Judge Russell in *McDougall v. Dunn*, 468 F.2d 468, 473 (4th Cir. 1972) and in part also by Judge Miller of this Court in *Burlington Industries v. Exxon Corporation*, 65 F.R.D. 26, 42 (D.Md. 1974). However, Judge Russell went on in *McDougall*, to hold (at 473) that, "[e]ven if * * * this view [the *Thomas Organ* standard] not be accepted," the statements in question were subject to production on the grounds that the party seeking discovery had shown "substantial need" and "undue hardship." In this case if the Thomas Organ construction of Rule 26(b)(3) is applied, and that rule is therefore construed to protect only those documents authored after consultation with an attorney, the investigative reports sought by plaintiffs must be produced by Aetna. In essence, what Coyne's deposition testimony reveals is that he followed normal investigation procedures [5] and that even if one or more of his superiors was consulting counsel and even if he (Coyne) recognized that there was a "strong possibility" of litigation, he (Coyne) was uninfluenced thereby and was himself seemingly not involved in any way in preparation for or contemplation of litigation when he compiled the documents plaintiffs seek.[6]

Numerous courts have cited *Thomas Organ* with approval and endorsed the view that Rule 26(b)(3) does not protect documents prepared by a non-attorney prior to consultation with counsel. However, that interpretation of the work product doctrine has been criticized by treatise writers as inconsistent with both the language and the spirit of Rule 26(b)(3).

> * * * With deference the authors are of the opinion that *Thomas Organ Co.* decision is a misinterpretation of the purpose and effect of the 1970 revision. The amended rule did not follow a "trend" toward production of statements made by non-lawyers. It followed a trend to equate "good cause" under former Rule

5. Aetna asserts that Coyne, "as early as July 19, 1977 contacted counsel with respect to Defendant's legal position in the event litigation should actually commence." Defendant's December 27, 1979 Memorandum in Opposition to Plaintiff's Motion to Compel Discovery, Doc. 38, at 5. The deposition testimony of Coyne reveals, however, that Coyne himself did not talk with counsel prior to the date on which the last of the investigatory documents sought herein was compiled. Coyne did testify that he knew that one of his superiors did speak with counsel with regard to "a legal question" prior to sometime in October 1977 (Coyne's deposition testimony at 17–20, 23–25, 29–30, 39–40), and that he himself early recognized a "strong possibility" of litigation. (Coyne's deposition testimony at p. 65; *see also* p. 61.) Nevertheless, he (Coyne) seemingly did nothing other than as called for by his customary investigative routine.

6. Even after an insurance company denies coverage, that does not mean every document prepared thereafter "was prepared in anticipation of litigation." *Westhemeco Ltd. v. New Hampshire Ins. Co.*, 82 F.R.D. 702, 709 (S.D.N.Y. 1979).

34 with relevancy in the case of general business records, but to require a showing of relevancy and need for the production of trial preparation materials, whether prepared by an attorney or by the party or his agent. See Committee Note of 1970 to Amended Subdivision (b), ¶ 26.-01[18], *supra,* under the paragraph *Treatment of Lawyers.* See also ¶¶ 26.63[8], 34.08. The language of the new Rule was carefully adapted to that end.

4 *Moore's Federal Practice,* ¶ 26.64 (1978–79 Supp.), at 68.

* * * Under the new language, however, there will be no technical distinction between materials prepared by the attorney in the case and those that are prepared by a claim agent, insurer, or other agent of the party, or by the party himself. Insofar as the "work product" doctrine is concerned, each will be judged upon the need to protect the privacy of the mental impressions, conclusions, opinions, or legal theories, of the attorney or other representative of the party. (footnote omitted.)

4 Moore's Federal Practice, ¶ 26.64[3] at 26–416 (1979).

The 1970 Advisory Committee Notes to Rule 26(b)(3) reinforce that latter construction of the Rule:

Subdivision (b)(3) reflects the trend of the cases by requiring a special showing, not merely as to materials prepared by an attorney, but also as to materials prepared in anticipation of litigation or preparation for trial by or for a party or any representative acting on his behalf. * *

48 F.R.D. 487, 502 (1970). *See also* Judge Layton's comment in *Spaulding v. Denton,* 68 F.R.D. 342, 345 (D.Del.1975): " * * * *Thomas's* flat requirement of a lawyer's involvement raises a bump which the 1970 Amendments had smoothed over * * *." Under the contra-*Thomas* approach, the standard to be applied in determining whether the material is protected from discovery because prepared in anticipation of litigation is the same whether the document is prepared by an attorney, or by a non-attorney, either with or without prior consultation with counsel. The fact that the non-attorney did or did not consult with counsel during the preparation of the document in question is, however, relevant, though not conclusively determinative, as to whether the document was prepared in anticipation of litigation. In this case, the record indicates that the investigative materials at issue were not prepared in anticipation of litigation. Thus, even if the *Thomas Organ* approach is disregarded, those materials are not protected from discovery under Rule 26(b)(3), since the qualified immunity does not extend to "[m]aterials assembled in the ordinary course of business . . . or for other nonlitigation purposes . . .." *See* Advisory Committee's Notes, 48 F.R.D. at 501.

■ The courts have repeatedly recognized that, while litigation often results from an insurance company's denial of a claim, it cannot be said that any document prepared by an insurance company after such a claim has arisen is prepared in anticipation of litigation within the meaning of Rule 26(b)(3). Thus, in *Westhemeco Ltd. v. New Hampshire Insurance Co.,* 82 F.R.D. 702, 708 (S.D.N.Y.1979) Judge Cooper wrote: " * * * The nature of the insurance business is such that an insurance company must investigate a claim prior to determining whether to pay its insured." To the same effect, Judge Will had earlier written in *Thomas Organ, supra,* 54 F.R.D. at 373:

If * * * the law were as suggested by the plaintiff, i. e., that after a claim has arisen, litigation may be deemed a contingency and any document prepared after such a claim has arisen is prepared in anticipation of litigation as concerns Rule 26(b)(3) irrespective of whether an attorney in the role of counsellor has been consulted, hardly any document authored by or for an agent of an insurance company could ever be discoverable without the showing of substantial need and undue hardship required by subsection (b)(3) of Rule 26. An insurance company by the nature of its business is not called

into action until one of its insured has suffered some form of injury and has a potential claim against some other party and/ the insurer itself. At this point, the insurer must conduct a review of the factual data underlying the claim, presumably through the talents of agents or employees who summarize the data for middle- or upper-management, the latter deciding whether to resist the claim, to reimburse the insured and seek subrogation of the insured's claim against the third party, or to reimburse the insured and forget about the claim thereafter. The logical absurdity of the plaintiff's position is that, under its theory, the amendments to the discovery rules which were believed to be a liberalization of the scope of discovery would be a foreclosure of discovery of almost all internal documents of insurance companies relating to the claims of insureds. We do not believe that Rule 26(b)(3) was designed to so insulate insurance companies merely because they always deal with potential claims. If this were true, they would be relieved of a substantial portion of the obligations of discovery imposed on parties generally that are designed to insure that the fact finding process does not become reduced to gamesmanship that rewards parties for hiding or obscuring potentially significant facts.

*Atlanta Coca-Cola Bottling Company v. Transamerica Insurance Company, supra,* like the case at bar, involved a suit on a fidelity policy in which an inventory exclusion provision (61 F.R.D. at 119) was in dispute. Therein, plaintiff propounded several interrogatories requesting defendant to "identify in specified particulars" (at 117) documents evidencing and resulting from defendant insurance company's investigation of plaintiff's claim. In response to defendant's argument that such information was protected by the Rule 26(b)(3) provisions governing trial preparation materials, Judge Freeman stated (at 118):

> * * * [T]he evaluation of claims of its policyholders is the regular, ordinary and principal business of defendant insurance company. Most of such claims result in payment by the defendant; it can hardly be said that the evaluation of a routine claim from a policyholder is undertaken in anticipation of litigation, even though litigation often does result from denial of a claim. The obviously incongruous result of the position urged by defendant would be that the major part of the files of an insurance company would be insulated from discovery.

That is not to suggest that *all* documents prepared by an insurance company in investigating a claim, are, by definition, compiled in the ordinary course of business and, thus, automatically subject to discovery. As Judge Cooper noted in *Westhemeco Ltd. v. New Hampshire Insurance Company, supra,* 82 F.R.D. at 708:

> At a certain point an insurance company's activity shifts from the ordinary course of business to anticipation of litigation. There is no hard and fast rule as to when this occurs. * * *

In sum, a court must determine "whether, in light of the nature of the document and the factual situation in the particular case, the document can fairly be said to have been prepared or obtained because of the prospect of litigation," 8 Wright & Miller, Federal Practice and Procedure, ¶ 2024, at 198 [footnote omitted], or whether it must be deemed to have been prepared in the company's ordinary course of business.[7]

In this case plaintiffs submitted a "proof of loss" to defendant Aetna on or about June 1, 1977, stating a claim under plaintiffs' fidelity policy. Coyne deposition at 9.) Since that proof of loss was not submitted by plaintiffs on the standard proof of loss form used by Aetna, defendant informed plaintiffs, by letter dated June 3, 1977, that a new proof of loss was needed. (*Tr.* at 10.) Plaintiffs complied, and submitted, on or about June 16, 1977, a second "proof of loss." (*Tr.* at 11.)

Apparently, even before receiving plaintiffs' second proof of loss, defendant began,

7. *See Miles v. Bell Helicopter Co.,* 385 F.Supp. 1029, 1033 (N.D.Ga.1974).

pursuant to its normal procedures, to investigate plaintiffs' claim. On June 2, 1977, the day after receiving plaintiffs' first proof of loss, Lavery, the supervisor of Aetna's Claims Department in White Plains, N. Y., sent a memorandum to Leo Davin, a claims investigation supervisor, indicating that APL had filed an employee dishonesty claim. (*Tr.* at 8.) Thereafter, on or about June 8, 1977, Davin assigned the APL claim investigation to Coyne, a Senior Claims Representative in Baltimore, Maryland. (*Tr.* at 7.)

In his deposition, Coyne explained Aetna's normal procedures in investigating employee dishonesty claims:

> Normally on an employee dishonesty claim our procedure is to receive the proof of loss and we would then investigate it from there.

> In other words, we take the information that is presented to us from the insured and begin the investigation; which would involve contacting the insured to develop any information or any additional information that they might have to substantiate the loss, contacting the principals involved—

> Q What do you mean by principals?

> A All right. The principals would be the employees who are designated as the ones who were responsible for the loss.

> Investigation would also involve contacting anyone else who may have any knowledge regarding the loss, whether it be an employee of the insureds, a principal, or some third party.

> Basically that's the format of the investigation.

(Tr. at 4–5.)

It was that procedure which Coyne followed in investigating APL's employee dishonesty claim. Soon after being assigned to the investigation, Coyne discussed the claim with his supervisor, Davin, "to go over exactly what the main points of an investigation like this should entail." (*Tr.* at 16.) It is to be noted that Coyne has indicated that he (Coyne) did not discuss with Davin at that time the possibility of litigation with respect to the APL claim. (*Tr.* at 17.)

On June 30, 1977, before having met with any representative of APL or any of the principals involved, Coyne filed his first report with regard to the APL claim investigation. Coyne testified at his deposition that that first report, on a standard Aetna form, is required to be filed by the claims investigator in connection with *all* claims within 30 days after the investigator receives the assignment. (*Tr.* at 13, 15–16.) On or about August 20, 1977, Coyne met for the first time with representatives of APL in Baltimore. At that initial meeting, Coyne simply discussed with APL personnel, in general terms, the nature of the plaintiffs' alleged loss, *i. e.*, who and what was involved (*Tr.* at 13), and made tentative plans to meet again with APL personnel in order to interview the employees involved. After the August 20, 1977 meeting, Coyne again discussed the APL claim with his supervisor, Davin, to determine what additional investigation was needed. Coyne testified that those discussions with Davin were simply *pro forma* reviews by his supervisor, typically conducted in connection with all cases, and were not prompted by any discussions with counsel. (*Tr.* at 20.)

After the August 20, 1977 meeting, Coyne proceeded to interview the principals involved in the alleged thefts—Martindale and Friedman. In September, 1977, Coyne met with Martindale, and the latter's attorney, in order to ask Martindale "to explain to me what he did, how he did it." (*Tr.* at 22.) Pursuant to his normal practice, Coyne took notes of his interview with Martindale (*Tr.* at 23.) On October 5, 1977, before interviewing the other principal involved in the thefts, *i. e.*, Friedman, Coyne met with several other employees of APL. (*Tr.* at 28–29.) Again, as per his usual practice, Coyne took notes at that meeting. (*Tr.* at 32.)

On October 11 and 13, 1977, Coyne contacted, by telephone, most of the merchants who had, according to the criminal indictment handed down against Martindale and Friedman, purchased the stolen goods from those two employees. Again, Coyne took

notes of those conversations in the regular course of his investigation, notes which Coyne has testified were not prepared in anticipation of litigation. (*Tr.* at 34–35.) Subsequently, on November 14, 1977, Coyne interviewed Friedman, the other principal involved, and again took notes of said interview. (*Tr.* at 36–37.)

On November 29, 1977, Coyne had a conversation with Fern, a claims adjuster representing APL. Fern inquired of Coyne as to whether Aetna was in a position to discuss settlement at that time. (*Tr.* at 38.) Coyne told Fern that Aetna had completed virtually all of its investigation but that he would have to discuss with his superiors what, if any, offer was going to be made. (*Tr.* at 39.) Fern apparently indicated to Coyne, at that time, that APL felt it was going to have to file suit, but that he (Fern) was trying to hold them off pending Aetna's investigation. (*Tr.* at 40.)

After the November 29, 1977 discussion with Fern, Coyne met with his then-supervisor, Marshall, and with Radley, the Claims Manager, to discuss the merits of plaintiffs' claim. (*Tr.* at 41.) As a result of those discussions, defendant decided to deny plaintiffs' claim of loss on the grounds that the bulk of plaintiffs' claim was based on inventory computation. A letter to that effect, denying plaintiffs' claim, was sent to APL on January 10, 1978. (*Tr.* at 40.)

In the course of his investigation, Coyne submitted three internal reports to Aetna's home office: the first on June 30, 1977, the second on September 22, 1977, and the third on January 24, 1978. (*Tr.* at 56.) All three of those documents were standard reports which Coyne was required, by Aetna's procedures, to submit in *all* cases. (*Tr.* at 57.)

The above-summarized facts disclose that the investigative materials sought by plaintiffs were not prepared by Coyne "in anticipation of litigation." As noted, *supra*, numerous courts have recognized that an in-

surance company must, in the ordinary course of its business, investigate and evaluate a policyholder's claim to determine whether or not to indemnify the alleged loss. In this case Coyne investigated plaintiffs' claim in the manner he investigated all other claims and prepared various investigative reports during the course of such routine investigation in accordance with Aetna's normal procedures. There is no evidence, with the exception of defendant's conclusory allegations to the contrary, that Coyne prepared the documents in question "*because of* the prospect of litigation." 8 Wright & Miller, *supra*, at 198 (emphasis added).

Aetna contends (Memorandum of Defendant in Opposition, at 5) that Coyne knew that litigation was to be expected when he compiled his reports:

> Perhaps the best evidence that the circumstances of Plaintiffs' claims were such as to reasonably give rise to the expectation of litigation was the revelation to Mr. Coyne by the insurance adjuster involved with the matter that Plaintiffs themselves had, for some time, expressed the view they would have to file suit. *Tr.*, at pp. 39–40.

However, Coyne had completed most of his investigation of plaintiffs' claim before he was told by Fern, on November 29, 1977, that plaintiffs might well have to file suit, and completed his investigation as he would have done regardless of the prospects of litigation.[8]

Defendant further suggests that the APL claim was not typical of most policyholders' claims and that, unlike a routine claim investigation, the investigation in this case was prepared with an eye towards litigation. In support of that contention, defendant points out that there was a large discrepancy between the amount of inventory shortage claimed by APL (approximately

---

**8.** Throughout his investigation of plaintiffs' claim, Coyne followed defendant's standard operating procedure in contacting the plaintiffs' representatives and in interviewing the principals involved. Coyne never met with an attorney to discuss aspects of plaintiffs' claim or the conduct of his investigation. From the moment the claims investigation was routinely assigned to Coyne until the time Coyne's evaluation of the claim was completed, defendant proceeded just as it would have with any other claim of employee dishonesty.

$836,000) and the amount of merchandise stolen as reflected in the police investigation ($7,044). There is no doubt that, when faced with that discrepancy, and in the light of its belief that the inventory exclusion clause of the policy precluded APL from relying on APL's inventory shortage calculation, Aetna felt that there was a good possibility that litigation might result. Nevertheless, Aetna had to conduct a routine investigation of plaintiffs' claim prior to determining whether or not to indemnify APL. While the police report, and the indictment, indicated that Martindale and Friedman had stolen merchandise worth approximately $7,000, there was no reason to believe that that wrongdoing uncovered by the police investigation constituted the *only* incidents of employee theft. Indeed Coyne testified, when asked whether he had determined that the losses reflected in the indictment were the only losses suffered by APL, that he had "understood that there could have been other merchants involved that had not been detected." (*Tr.* at 54.) Thus, it was not until it had conducted a thorough investigation of plaintiffs' claim that Aetna decided to deny plaintiffs' claim for indemnification. And it was not until that determination was made that "there was a substantial probability that litigation would occur and that commencement of such litigation was *imminent.*" *Home Insurance Co. v. Ballenger Corp.*, 74 F.R.D. 93, 101 (N.D. Ga.1977), *citing Miles v. Bell Helicopter Co.*, 385 F.Supp. 1029, 1033 (N.D.Ga.1974) (emphasis added.)

For the reasons set forth *supra*, the documents sought by plaintiffs are not subject to "work product" immunity under Rule 26(b)(3). Accordingly, defendant is required to produce those documents.