CONNECTICUT INDEMNITY COMPANY, Petitioner,

v.

CARRIER HAULERS, INC. and The R.J. Reynolds Tobacco Company, Respondents,

and

Carrier Haulers, Inc., Third–Party Plaintiff,

v.

Meeker Sharkey Financial Group, Inc., a/k/a Meeker, Sharkey & Moffatt, Third–Party Defendant.

No. 5:00CV72–V.

United States District Court, W.D. North Carolina, Statesville Division.

Nov. 17, 2000.

---

Rex C. Morgan, Kevin P. Branch, Baucom, Claytor, Benton, Morgan & Wood, Charlotte, NC, Scott W. McMickle, Alisa W. Terry, Dennis, Corry & Porter, LLP, Atlanta, GA, for plaintiff.

Jeffrey E. Oleynik, Derek J. Allen, Brooks, Pierce, McLendon, Humphrey & Leonard, LLP, Greensboro, NC, for Carrier Haulers, Inc.

Richard T. Rice, Womble, Carlyle, Sandridge & Rice, Winston–Salem, NC, Garth A Gersten, Womble, Carlyle, Sandridge & Rice, Raleigh, NC, John F. Parker, William C. Kolb, Mound, Cotton & Wollan, New York City, for R.J. Reynolds Tobacco Company.

Urs R. Gsteiger, Wilson & Iseman, Winston–Salem, NC, Peter L. Korn, McDonough, Korn & Eichhorn, Springfield, NJ, for Meeker Sharkey Financial Group, Inc.

### MEMORANDUM AND ORDER

HORN, United States Chief Magistrate Judge.

**THIS MATTER** is before the Court on the following motions and memoranda:

1. "Petitioner's Motion to Quash Subpeona" and "Petitioner's Brief in Support ..." (N.D.Ga. document # 31, N.C.W.D. document # 1), both filed April 14, 2000;

2. "Petitioner's Motion for Protective Order" and "Petitioner's Brief in Support ..." (N.D.Ga. document # 38, N.C.W.D. document # 1), both filed April 26, 2000;

3. Respondent R.J. Reynolds Tobacco's "Motion to Compel" (document # 27) and "Brief in Support ..." (document # 28), both filed August 7, 2000;

4. Petitioner's "Brief in Opposition to Motion to Compel" (document # 32) filed September 6, 2000;

5. Petitioner's "Affidavit of Donald Roberts" (document # 33) filed September 8, 2000;

6. Respondent R.J. Reynolds Tobacco's "Reply Brief in Support of Motion to Compel" (document # 36) filed September 22, 2000; and

7. Respondent Carrier Haulers' "Motion to Compel" (document # 37), "... Brief in Support ..." (document # 38), "Affidavit of Robert H. Gourley, Sr." (document # 39), and "Affidavit of Thomas C. Campbell" (document # 40), all filed September 25, 2000.[1]

The time for filing any further responsive or reply briefs has expired.

Having carefully reviewed the pleadings, record, arguments of counsel, and applicable authority, as well as having conducted a thorough *in camera* review of the disputed documents, the Court will *deny* the Petitioner's Motion to Quash and Motion for a Protective Order and will *grant in part* and *deny in part* the Respondents' respective Motions to Compel.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Respondent Carrier Haulers, Inc. ("Carrier"), a New Jersey corporation, is a trucking company with its principal office in Statesville, North Carolina. The Petitioner, Connecticut Indemnity Company ("Connecticut"), is a Connecticut insurance company and subsidiary of Orion Capital.

On January 25, 1999, after receiving an insurance application that Carrier filed through an insurance agent, Third Party Defendant Meeker Sharkey Financial Group, Inc. ("Meeker"), Connecticut issued Carrier a motor carrier liability coverage policy (Policy No. 720040, "the Policy").

Respondent R.J. Reynolds Tobacco Company ("RJR"), a Delaware corporation with its principal place of business in Winston–Salem, North Carolina, was specifically named on a $1,000,000 endorsement to the

---

1. This matter was referred to the undersigned on October 2, 2000.

Policy for its goods that were shipped by Carrier. Obtaining $1,000,000 in coverage was a pre-condition before RJR would ship its goods on Carrier's trucks.

Between 10pm on June 13, 1999, and 2am on June 14, 1999, a Carrier trailer, loaded with RJR cigarettes valued at approximately $1.2 million, was stolen while parked overnight at a terminal facility ("the Facility") in McDonough, Georgia. The trailer was recovered but the cigarettes were not.

Within days, both Carrier and RJR made claims on the above-referenced Policy and endorsement. Carrier made its claim through Meeker, while RJR filed a claim directly with Connecticut, which began to "adjust"—or investigate—the claim.

Connecticut repeatedly told RJR and Carrier that it was "imperative" that they cooperate with the investigation. On July 7 and July 29, 1999, Connecticut wrote the Respondents that its investigation was continuing and further that the adjustment would be conducted on Connecticut's behalf by U.S. Adjustment Corp. On September 10, 1999, Connecticut's attorney requested an "examination under oath" ("EUO") of Carrier's President, Tom Campbell.

On October 21, 1999, Mr. Campbell was questioned under oath for three hours, answering every question he was asked, and promising to produce every document that Connecticut's counsel requested.

Carrier alleges that at the conclusion of the "examination under oath," Connecticut's counsel "made it very clear that Connecticut could 'sit' on the claim and engage in several years of protracted litigation without ever technically denying the claim," and further alleges that Connecticut's counsel "made it clear that Connecticut understood that such a lawsuit [and failure to pay the claim] would eventually put Carrier out of business." Connecticut vehemently denies these allegations.

On November 2, 1999, Carrier demanded by letter that Connecticut pay the claim or face a "bad faith claim." On November 3, 1999, Connecticut's counsel responded that he "would respond in detail ... by [Carrier's] specified deadline."

Instead, the same day, Connecticut filed the instant action, for a declaratory judgment of no coverage under the Policy, in the United States District Court for the Northern District of Georgia.

Connecticut alleges "no coverage" on two theories:

1) that recovery is precluded under N.C.Gen.Stat. § 58-3-10 because Carrier made material misrepresentations on its insurance application, specifically, not informing Connecticut of an earlier "lost" shipment of cigarettes, undervaluing the anticipated RJR cargo, and overstating security precautions at the Facility; and

2) that the Policy generally excludes "loss ... while property is located ... on premises owned, leased, or occupied by [the insured]." Connecticut admits that a Policy endorsement extended coverage to some of Carrier's terminals, but argues that coverage did not extend to the Facility in Georgia which was not listed on the endorsement.

On December 20, 1999, Carrier and RJR each filed an Answer and Counterclaim, including claims for payment under the Policy and a "bad faith" claim. RJR additionally filed a Cross–Claim against Carrier.

On January 3, 2000, Carrier filed a Third Party Complaint against Meeker for negligence in completing and submitting its insurance application to Connecticut. On April 20, 2000, RJR filed a similar Cross–Claim against Meeker.

On March 15, 2000, Carrier filed a "Motion To Transfer Venue" (N.D.Ga. docket # 24) to the Western District of North Carolina.

On April 14, 2000, Connecticut moved to Quash a Subpeona and further moved, on April 26, 2000, for a Protective Order, both relating to RJR's proposed deposition of Connecticut's retained adjuster, Steve Gwertzman of U.S. Adjustment Corp., on the grounds of both work product and attorney client privilege. The record does not reflect when the proposed deposition was to be taken, although apparently it was to be taken in New York.

In a May 8, 2000 "Order" (N.D.Ga. document # 51), the Hon. Richard W. Story

granted Carrier's Motion to Transfer Venue and the case was assigned to the Statesville Division of the Western District of North Carolina.

RJR and Carrier each served Connecticut with Requests for Production of Documents, including Requests that Connecticut produce its entire claim and underwriting files regarding the Policy and loss at issue in this case, as well as all claims files for the last five years relating to the particular Policy endorsement at issue here—a BMC 32.

On May 22, 2000, Connecticut objected to those Requests and provided a lengthy privilege log, which claims attorney client and/or work product privilege in 39 documents dating from June 21 to November 2, 1999. The undersigned has reviewed these disputed documents *in camera*. As to the request for the BMC 32 claims files from the past five years, Connecticut responds that it has 30,000 to 45,000 files over that time period and could not pull out the files relating to BMC 32 claims unless it manually reviewed each file.

On May 24, 2000, Connecticut amended its Petition, alleging that it had cancelled the Policy and offered to return all premiums on July 23, 1999; that Carrier made two additional claims on the Policy allegedly occurring prior to the loss at issue and totaling more than $8,000.00; and that Carrier made a final claim, alleging a loss on September 17, 1999, in an amount of $13,807.20.

RJR and Carrier, on August 7 and September 25, 2000, respectively, filed Motions to Compel. These matters have been briefed as discussed above and are now ripe for determination.

## II. *DISCUSSION*

### A. *Discovery and Motions to Compel*

■ Rule 26(b)(1) of the Federal Rules of Civil Procedure provides that:

Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition, and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. The information sought need not be admissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence.

The rules of discovery are to be accorded broad and liberal construction. *See Herbert v. Lando*, 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979); *and Hickman v. Taylor*, 329 U.S. 495, 507, 67 S.Ct. 385, 91 L.Ed. 451 (1947).

■ Whether to grant or deny a motion to compel is generally left within the district court's broad discretion. *See, e.g., Lone Star Steakhouse & Saloon, Inc. v. Alpha of Va., Inc.*, 43 F.3d 922, 929 (4th Cir.1995) (denial of motions to compel reviewed on appeal for abuse of discretion); *Erdmann v. Preferred Research Inc.*, 852 F.2d 788, 792 (4th Cir. 1988) (noting district court's substantial discretion in resolving motions to compel); *and LaRouche v. National Broadcasting Co.*, 780 F.2d 1134, 1139 (4th Cir.1986) (same).

However, regarding cases such as this, where work product doctrine or attorney-client privilege is raised in objection to a discovery request, the Fourth Circuit has recently stated that "[w]e review the district court's decision that certain documents are subject to privilege *de novo*, since it involves a mixed question of law and fact." *Chaudhry v. Gallerizzo*, 174 F.3d 394, 402 (4th Cir.), *cert. denied*, 528 U.S. 891, 120 S.Ct. 215, 145 L.Ed.2d 181 (1999). *Accord In re Grand Jury Proceedings*, 33 F.3d 342, 353 (4th Cir.1994).

### B. *Motion to Compel Production of All Claims Files Containing BMC 32 Endorsement*

■ At the outset, the undersigned notes that the Request to Produce *all* claims files relating to the BMC 32 policy endorsement over a five year period is over broad and unduly burdensome—that is, Connecticut would be required to hand search between 30,000 and 45,000 files in order to comply

with the request. *See* Fed.R.Civ.P. 26(b)(2)(iii). Therefore, the undersigned, at this time, will deny RJR's and Carrier's respective motions to compel production of the BMC 32 claims files, without prejudice to the Respondents preparing a more narrowly drawn request.

### C. *Work Product*

■ Documentary evidence qualifies as work product if it is prepared "in anticipation of litigation." *National Union Fire Ins. v. Murray Sheet Metal,* 967 F.2d 980, 984 (4th Cir.1992). *Accord In re Allen,* 106 F.3d 582, 607 (4th Cir.1997); *and Grand Jury,* 33 F.3d at 348. That is, "[t]he document must ... [have been] prepared because of the prospect of litigation.... [M]aterials prepared in the ordinary course of business ... or for other non-litigation purposes" are not protected. *National Union,* 967 F.2d at 984. The work product privilege is intended to prevent a litigant from taking a free ride on the research and thinking of his opponent's lawyer and to avoid the resulting deterrent to a lawyer's committing his thoughts to paper. *See, e.g., United States v. Nobles,* 422 U.S. 225, 238, 95 S.Ct. 2160, 45 L.Ed.2d 141 (1975); *and Taylor,* 329 U.S. at 510–11, 67 S.Ct. 385.

■ As the Fourth Circuit described the work product doctrine most recently:

Under the work product rule, codified in Fed.R.Civ.P. 26(b)(3), an attorney is not required to divulge, by discovery or otherwise, facts developed by his efforts in preparation of the case or opinions he has formed about any phase of the litigation.... Fact work product is discoverable only upon a showing of both a substantial need and an inability to secure the substantial equivalent of the materials by alternate means without undue hardship. Opinion work product is even more carefully protected, since it represents the thoughts and impressions of the attorney ..... [a]n attorney's thoughts are inviolate, ... and courts should proceed cautiously when requested to adopt a rule that would have an inhibitive effect on an attorney's freedom to express and record his mental impressions and opinions without fear of having these impressions and opinions used against the client. As a result, opinion work product enjoys a nearly absolute immunity and can be discovered only in very rare and extraordinary circumstances.

*Chaudhry,* 174 F.3d at 403 (internal citations omitted). *Accord Grand Jury,* 33 F.3d at 348; *and In re Doe,* 662 F.2d 1073, 1077–80 (4th Cir.1981).

■ "The application of the work product doctrine is particularly difficult in the context of insurance claims." *Kidwiler v. Progressive Paloverde Ins. Co.,* 192 F.R.D. 536, 541–42 (N.D.W.Va.2000). In a factually similar case in the Middle District of North Carolina, the Court rejected the insurance company's contention that its files were protected by the work product privilege. The Court explained:

Because an insurance company has a duty in the ordinary course of business to investigate and evaluate claims made by its insureds, the claims files containing such documents usually cannot be entitled to work product protection. Normally, only after the insurance company makes a decision with respect to the claim, will it be possible for there to arise a reasonable threat of litigation so that information gathered thereafter might be said to be acquired in anticipation of litigation. This is not to say that the threat of litigation may never arise at an earlier time. *However, if the insurer argues it acted in anticipation of litigation before it formally denied the claim, it bears the burden of persuasion by presenting specific evidentiary proof of objective facts demonstrating a resolve to litigate.*

*Pete Rinaldi's Fast Foods, Inc. v. Great American Ins. Companies,* 123 F.R.D. 198, 202 (M.D.N.C.1988) (emphasis added). *See also Ring v. Commercial Union Ins. Co.,* 159 F.R.D. 653, 656 (M.D.N.C.1995) ("[I]n general, only documents accumulated after the claim denial will be done in anticipation of litigation"); *Video Warehouse of Huntington, Inc. v. Boston Old Colony Ins. Co.,* 160 F.R.D. 83, 85 (S.D.W.Va.1994) ("As has been observed, discovery of documents by an insured from its insurer presents a special

problem for application of the work-product rule because it is the ·very nature of an insurer's business to investigate and evaluate the merits of claims"); *Harper v. Auto–Owners Ins. Co.*, 138 F.R.D. 655, 662 (S.D.Ind. 1991); *Hydramar, Inc. v. General Dynamics Corp.*, 115 F.R.D. 147 (E.D.Pa.1986) ("without proof, it is reasonable to assume that litigation is not anticipated from negotiations until receipt of a specific threat"); *Western Nat. Bank v. Employers Ins. of Wausau*, 109 F.R.D. 55 (D.Colo.1985); *State Farm Fire and Cas. Co. v. Perrigan*, 102 F.R.D. 235, 237 (W.D.Va.1984) ("[t]he nature of the insurance business requires an investigation prior to the determination of the insured's claim ... [and] at some point an insurance company [may shift] its activity from the ordinary course of business to anticipation of litigation, and no hard and fast rule governs when this change occurs"); *APL v. Aetna Cas. & Sur. Co.*, 91 F.R.D. 10 (D.Md.1980); *and Atlanta Coca–Cola Bottling Co. v. Transamerica Ins. Co.*, 61 F.R.D. 115, 118 (N.D.Ga.1972) ("the evaluation of its policyholders is the regular, ordinary and principal business of defendant insurance company").

Connecticut relies on the disputed documents themselves, particularly as they relate to its decision to retain an outside adjuster, Steve Gwertzman of U.S. Adjustment Corp., and legal counsel, Scott McMickle of Dennis, Corry and Porter, L.L.P., Atlanta, Georgia, as "specific evidentiary proof of objective facts demonstrating a resolve to litigate" predating the filing of the instant action on November 3, 1999.

 The undersigned notes, however, that neither retaining legal counsel nor failing to do so is conclusive proof of whether a party has "resolved to litigate." *Accord Kidwiler*, 192 F.R.D. at 541–42; *and Fine v. Bellefonte Underwriters Ins. Co.*, 91 F.R.D. 420, 421 (S.D.N.Y.1981). Further, the documents reveal that Mr. McMickle was retained on July 7, 1999, to provide a coverage opinion, a process not finally completed until November 2, 1999—that is, following Mr. Campbell's October 22, 1999 "examination under oath."

 Moreover, adjusting a claim is indisputably "the very nature of an insurer's business" and is not normally performed "in anticipation of litigation." *Video Warehouse*, 160 F.R.D. at 85. Indeed, the contested documents show that the adjusting process continued until November 2, 1999—after Mr. Campbell's "examination under oath" and receipt of Carrier's letter threatening a bad faith lawsuit. Specifically, a September 16, 1999 inter-office memorandum not only reflects that Connecticut had not yet resolved to litigate, but also highlights several key issues, both factual and legal, which the Petitioner wanted resolved *prior to* deciding whether to litigate. A September 21, 1999 letter by Mr. McMickle clearly responds that those concerns could not be answered until after Mr. Campbell was questioned—particularly about the alleged misrepresentations on the insurance application and Carrier's status as a possible owner or tenant at the Georgia facility. Following the "examination under oath," in which Mr. Campbell gave answers that Connecticut believes supports its contentions for "no coverage," the Petitioner resolved to file the instant action.

 In short, except for Mr. McMickle's last letter, dated November 2, 1999, which is protected by attorney client privilege as discussed below,[2] *none* of the disputed documents were prepared in "anticipation of litigation." Therefore, those documents, dated June 21 to October 22, 1999, are *not* protected by work product privilege and Connecticut must produce them, except for those protected by Connecticut's attorney client privilege, as discussed below.

### D. *Attorney–Client Privilege*

 The attorney-client privilege is intended to encourage those who find themselves in actual or potential legal disputes to be candid with lawyers who advise them, and is one of the oldest recognized privileges protecting confidential communications. *See Upjohn Co. v. United States*, 449 U.S. 383, 389, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981); *and Hunt v. Blackburn*, 128 U.S. 464, 470, 9

**2.** The November 2, 1999 letter recounts and analyzes Mr. Campbell's "examination under oath" and states the attorney's opinion as to coverage as well as his litigation·strategy.

S.Ct. 125, 32 L.Ed. 488 (1888). The attorney-client privilege is intended to encourage "full and frank communication between attorneys and their clients and thereby promote broader public interests in the observance of law and the administration of justice." *Upjohn,* 449 U.S. at 389, 101 S.Ct. 677. *Accord Swidler & Berlin v. U.S.,* 524 U.S. 399, 404, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998).

▆▆▆ When the privilege applies, it affords confidential communications between lawyer and client complete protection from disclosure. However, since it impedes the full and free discovery of the truth, the attorney-client privilege is narrowly construed. *See Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980); *In re Grand Jury Subpoena,* 204 F.3d 516, 519–20 (4th Cir.2000); *and Hawkins v. Stables,* 148 F.3d 379, 383 (4th Cir.1998). Further, it is well-settled in the Fourth Circuit that "[t]he proponent of the privilege must establish ... that the privilege was not waived." *In re Grand Jury Subpoena,* 204 F.3d at 522.

▆▆ As with the work product privilege, applying the attorney client privilege in the context of insurance claims is particularly difficult. The Fourth Circuit examined this issue in *In re Allen,* 106 F.3d 582, 602–03 (4th Cir.1997), and explained:

> Of course, not all communications between an attorney and client during attorney-conducted investigations constitute legal work entitled to attorney-client privilege ... no privilege attaches when an attorney performs investigative work in the capacity of an insurance claims adjuster, rather than as a lawyer.... But even in these cases the courts did not suggest, let alone hold, that investigation can never constitute legal work. Quite the contrary, they carefully instructed that only to the extent attorneys acted as claims adjusters, a pure, ordinary business function, was their investigation outside the scope of the asserted privileges. In sum, *Upjohn* made "clear that fact finding which pertains to legal advice counts as professional legal services...." Accordingly, we must reject the legal theory ... that the attorney-client privilege does not apply here, simply because [the attorney's] assigned duties

were investigative in nature. *The relevant question is not whether [the attorney] was retained to conduct an investigation, but rather, whether this investigation was related to the rendition of legal services.* If it was, and it clearly was here, then the privilege is not waived.

*Id.,* 106 F.3d at 602–03 (emphasis added) (internal citations and quotations omitted). *Accord Upjohn,* 449 U.S. at 389, 101 S.Ct. 677; *United States v. Rowe,* 96 F.3d 1294, 1297 (9th Cir.1996); *In re Grand Jury Subpoena,* 599 F.2d 504, 510–11 (2d Cir.1979) (investigation by law firm retained to investigate and provide legal advice based on that investigation "trigger[s] the attorney-client privilege"); *Harper v. Auto–Owners Ins. Co.,* 138 F.R.D. 655, 671 (S.D.Ind.1991) ("To the extent this attorney acted as a claims adjuster, claims process supervisor, or claim investigation monitor, and not as a legal advisor, the attorney-client privilege would not apply"); *Mission Nat'l Ins. Co. v. Lilly,* 112 F.R.D. 160, 163 (D.Minn.1986) (pure, ordinary business function outside the scope of the attorney client privilege); *In re Int'l Sys. & Controls Corp. Sec. Litig.,* 91 F.R.D. 552, 557 (S.D.Tex.1981) (confidential communications made to attorneys "hired to investigate through the trained eyes of an attorney" privileged), *vacated on other grounds,* 693 F.2d 1235 (5th Cir.1982); *and In re LTV Sec. Litig.,* 89 F.R.D. 595, 600–01 (N.D.Tex.1981) (rejecting argument that attorney privilege should not apply when the attorneys involved performed an investigative rather than strictly legal function).

As noted, on July 7, 1999, Connecticut retained Mr. McMickle for the purpose of obtaining a coverage opinion, which was not completed until November 2, 1999. Although Mr. McMickle did briefly retain an investigator, Heinz Rost, in an attempt to recover the missing cigarettes, the record establishes that, in all other respects, Connecticut's Senior Examiner, Don Roberts, was in charge of the investigation, including directing the actions of the outside adjuster, Steve Gwertzman of U.S. Adjustment Corp. Notably, Mr. McMickle did not contact Mr. Gwertzman at all until August 11, 1999, when he wrote with questions regarding the results of Mr.

Gwertzman's investigation. Subsequent communications between Mr. McMickle and Mr. Gwertzman were of the same nature—that is, discussing Mr. Gwertzman's findings.

 In short, because Mr. Mickle's involvement n any fact finding or investigation was clearly related to his "rendition of legal services to" Connecticut, the attorney client privilege protects confidential communications between Mr. McMickle, the lawyers assisting him, and his staff, and Connecticut, its agents, and its employees. *Accord Upjohn,* 449 U.S. at 389, 101 S.Ct. 677; *and In re Allen,* 106 F.3d at 602–03.

Twenty-five of the disputed documents are, or commemorate, such confidential communications and are therefore protected by attorney client privilege. Referring to them as they have been "bate stamped" by Connecticut,[3] the *protected* documents are:

1. # 20093—undated memorandum memorializing telephone conversation with Scott McMickle.

2. # 20085–20089—July 7, 1999 letter, from Don Roberts to attorney Clay Porter at Dennis, Corry, and Porter.

3. # 20079–20081—July 9, 1999 letter, from Ruth E. Crisman, Legal Assistant to Clay Porter, to Don Roberts.

4. # 20072–20076—July 22, 1999 memorandum, from Connecticut's underwriter to Scott McMickle.

5. # 20068—July 29, 1999 memorandum, memorializing conversation with Scott McMickle.

6. # 20065–20067—August 11, 1999 letter, from Scott McMickle to Don Roberts and Steve Gwertzman.

7. # 20061–20064—August 11, 1999 letter, from Scott McMickle to Don Roberts.

8. # 20058–20060—August 13, 1999 invoice, from Scott McMickle to Don Roberts.

9. # 20056–57—August 20, 1999 letter, from Scott McMickle to Don Roberts.

10. # 20048–20051—faxed copy of # 9 above.

11. # 20047—August 26, 1999 letter, from Don Roberts to Scott McMickle.

12. # 20040–20043—August 30, 1999 fax, from Don Roberts to Lisa Peverill, paralegal to Scott McMickle.

13. # 20038–20039—August 30, 1999 letter, from Scott McMickle to Don Roberts and underwriter.

14. # 20034–20037—August 31, 1999 letter, from Scott McMickle to Steve Gwertzman.

15. # 20031–20033—August 31, 1999 fax, from Don Roberts to Scott McMickle.

16. # 20029–20030—September 3, 1999 letter, from attorney Alison Terry of Dennis, Corry, and Porter, to Don Roberts.

17. # 20028—September 3, 1999 letter, from Scott McMickle to Don Roberts.

18. # 20022–20027—September 15, 1999 letter, from Scott McMickle to Don Roberts.

19. # 20021—September 16, 1999 memorandum memorializing communication with Scott McMickle.

20. # 20020—September 20, 1999 fax, from Don Roberts to Scott McMickle.

21. # 20016–20019—September 21 1999 letter, from Scott McMickle to Don Roberts.

22. # 20015—September 22, 1999 memorandum by Don Roberts memorializing phone conference with Scott McMickle.

23. # 20013–20014—September 24, 1999 memorandum by Don Roberts memorializing communication with Scott McMickle.

24. # 20011–20012—October 6, 1999 letter, from Scott McMickle to Don Roberts.

---

**3.** In complying with the undersigned's request for *in camera* review, Connecticut's counsel provided an updated privilege log which refers to each document by its "bate stamp." For ease of reference for the parties, a copy of that log is attached to this Memorandum and Order.

25. # 2001–2006—November 2, 1999 letter, from Scott McMickle to Don Roberts.[4]

The remaining 14 documents identified in the attached privilege log are *not* privileged or otherwise protected confidential communications, and therefore, must be produced.

### E. *Motion to Quash and Protective Order*

██ Through its motions to quash and for a protective order, Connecticut seeks to prevent the deposition of its outside adjuster, Mr. Gwertzman, also on the grounds of the work product and attorney client privileges.

As already stated, however, the work product privilege does not apply until November 2, 1999, when Connecticut finally resolved to litigate this matter. Moreover, even if documents are work product privileged, it is well settled "that the facts themselves ... are not [so] privileged" and depositions are the preferred method of discovering those facts. *See Ring*, 159 F.R.D. at 658–59.

██ As has also been noted, Connecticut's attorney client privilege, in relation to the outside adjuster, applies only to confidential communications that Mr. Gwertzman had with Mr. McMickle, that is—Mr. McMickle's August 11, 1999 and August 31, 1999 letters to Mr. Gwertzman. In contrast, Mr. Gwertzman conducted a wide-ranging investigation well beyond the scope of any confidential communication with Mr. McMickle contained in these two letters. Therefore, to prohibit his deposition would prevent RJR and Carrier from discovering non-privileged information that is reasonably calculated to lead to the discovery of admissible evidence. *Accord Herbert*, 441 U.S. at 177, 99 S.Ct. 1635; *and Taylor*, 329 U.S. at 507, 67 S.Ct. 385.

Accordingly, Connecticut's motions to quash and for a protective order must and shall be denied.

4. This document is also the one document subject to work product privilege protection.