Harry T. HARPER, III; Harry T. Harper, III, d/b/a Best Body Shop, Plaintiffs and Counterclaim Defendants,

v.

AUTO–OWNERS INSURANCE COMPANY, Defendant and Counterclaim Plaintiff.

UNITED STATES of America, Plaintiff,

v.

AUTO–OWNERS INSURANCE COMPANY, Defendant.

AUTO–OWNERS INSURANCE COMPANY, Third-party Plaintiff,

v.

Harry T. HARPER, III; Harry T. Harper, III, d/b/a Best Body Shop, Third-party Defendants.

No. IP 88–1181–C.

United States District Court, S.D. Indiana, Indianapolis Division.

Aug. 13, 1991.

As Revised Oct. 18, 1991.

Charles T. Jennings and Donna H. Fisher of Jennings & Maas, Carmel, Ind., and William F. Thompson, Indianapolis, Ind., for Auto–Owners Ins. Co.

Robert W. Geddes and Michael E. Simmons, Indianapolis, Ind., for Harry T. Harper, III.

Gerald A. Coraz, Asst. U.S. Atty., and Francine Protogere, Small Business Admin., Indianapolis, Ind., for U.S.

KENNARD P. FOSTER, United States Magistrate Judge.

## ENTRY AND ORDER

The plaintiff, Harry Harper, moves to compel the production of various documents his insurer, Auto–Owners Insurance Company ("Auto–Owners"), defendant in this action, generated in relation to the plaintiff's claim for a fire loss which destroyed his business. Auto–Owners opposes the motion claiming that the documents are privileged. The documents were reviewed *in camera* and the parties' positions fully briefed and orally argued. For the reasons given below, the plaintiff's motion is granted in part and denied in part.

A fire destroyed the Best Body Shop, an auto-body shop owned by the plaintiff, on February 1, 1987. The parties do not dispute that the fire was arson. Auto–Owners was informed the day of the fire that the local fire department reported the cause as arson. Auto–Owners shortly thereafter employed outside experts to conduct investigations into the cause and origin of the fire and the background of the plaintiff. On February 6th Auto–Owners retained private counsel to monitor the progress of the case, ensure compliance with state arson reporting requirements, and examine the insured under oath pursuant to the terms of its policy. A decision to deny the claim was recorded in Auto–Owners' file on April 3, 1987, and a denial notice was sent to the plaintiff on April 14th.

In this diversity action, the plaintiff claims that Auto–Owners' denial of coverage constitutes a breach of contract in bad faith because it had insufficient evidence that he was responsible for the arson. He now seeks discovery of all documents in Auto–Owners' claims file. Auto–Owners argues that because it routinely anticipates litigation with an insured when a fire is reported as incendiary, and thereupon commences a specialized investigatory process, all documents that were produced after it received notice the day of the fire that the cause was arson are immune from discovery under the attorney/party work product rule (*Fed.R.Civ.P.* 26(b)(3)), the expert work product rule (*Fed.R.Civ.P.* 26(b)(4)), and the attorney-client privilege.

### A. Work Product Privilege.

 Unlike the attorney-client privilege, application of the work product rule in federal courts is governed by federal, not state, law.[1] *Hickman v. Taylor,* 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451 (1947); *Pete Rinaldi's Fast Foods v. Great American Insurance Companies,* 123 F.R.D. 198, 201 (M.D.N.C., 1988); *Cf. Federal Rule of Evidence* 501. Protection for work product is not absolute, more accurately being described as a "limited immunity" rather than a privilege, *Carver v. Allstate Industries, Inc.,* 131 F.R.D. 560, 569 (S.D.Ind. 1990).

---

**1.** "Thus, although the Indiana decisions cited by the parties are of some assistance in this matter, they are not dispositive." *Henderson v. Zurn*

*Insurance Company,* 94 F.R.D. 131, 133 (S.D.Geo.1982); *Pete Rinaldi's,* 123 F.R.D. at 201, because disclosure may be ordered on a showing of substantial need for the materials. The source of the immunity is *Federal Rule of Civil Procedure* 26(b)(3) (hereinafter, the "Rule"):

> Subject to the provisions of subdivision (b)(4) of this rule, a party may obtain discovery of documents and tangible things otherwise discoverable under subdivision (b)(1) of this rule and prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including the other party's attorney, consultant, surety, indemnitor, insurer, or agent) only upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means. In ordering discovery of such materials when the required showing has been made, the court shall protect against disclosure of the mental impression, conclusions, opinions, or legal theories of an attorney or other representative of a party concerning the litigation....

The party resisting disclosure has the burden of establishing the documents' eligibility for protection. *Binks Manufacturing Company v. National Presto Industries, Inc.,* 709 F.2d 1109, 1120 (7th Cir.1983).

The threshold question, then, is whether the requested documents were produced "in anticipation of litigation." This phrase eludes precise definition, which has resulted in a variety of approaches and conflicting decisions in the case law—especially in the insurance context. Professors' Wright and Miller's explanation of its meaning, while not producing uniformity or consensus, has been the one most often cited with approval by the courts:

> Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the documents can fairly be said to have been prepared or obtained because of the prospect of litigation.

8 C. Wright and A. Miller, *Federal Practice and Procedure, Civil,* § 2024; quoted with approval in *Binks,* 709 F.2d at 1118.

■ The work product standard has two components. The first is what may be called the "causation" requirement. This is the basic requirement of the Rule that the document in question be produced *because of* the anticipation of litigation, *i.e.,* to prepare for litigation or for trial. The second component is what may be termed a "reasonableness" limit on a party's anticipation of litigation. Because litigation can, in a sense, be foreseen from the time of occurrence of almost any incident, courts have interpreted the Rule to require a higher level of anticipation in order to give a reasonable scope to the immunity. This second component is more of a practical tool to assist a court in applying the fundamental causation test of the Rule. Proper application of the work product rule requires both components, yet some courts have appeared to apply the "reasonable anticipation" test exclusively: they determine at what point in time litigation could reasonably have been anticipated and find that all documents subsequently produced are work product, without inquiring into whether the documents were produced for litigation or non-litigation purposes. Because the parties in this case approach the problem similarly, or rely on decisions which do, a more thorough treatment of the Rule will be undertaken.

■ *Reasonable anticipation.* The Rule requires that the subject documents be produced "in anticipation of litigation." However, because litigation can be anticipated, in a general sense, at the time almost any incident occurs—thus closing off much pertinent discovery—courts have interpreted the Rule to require a more substantial and specific threat of litigation before a party's anticipation will be considered a reasonable and justifiable motivating force. There are many formulations of this level of threat, but the cases gener-

ally concur that a party must show more than a "remote prospect," an "inchoate possibility," or "a likely chance" of litigation. *Mission National Insurance Company v. Lilly,* 112 F.R.D. 160, 163 (D.Minn. 1986); *Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 604 (8th Cir.1977); *Airheart v. Chicago and North Western Transportation Company,* 128 F.R.D. 669, 671 (D.S.D.1989). Rather, a party must demonstrate that "at the very least some articulable claim, likely to lead to litigation" had arisen, *Binks,* 709 F.2d at 1119, quoting *Coastal States Gas Corporation v. Department of Energy,* 617 F.2d 854, 865 (D.C.Cir.1980), that the probability of litigation is "substantial and imminent", *Carver,* 94 F.R.D. at 134; *Home Insurance Company v. Ballenger Corporation,* 74 F.R.D. 93, 101 (N.D.Ga.1977), "objective facts establishing an identifiable resolve to litigate", *Binks,* 709 F.2d at 1119, or "an identifiable specific claim or impending litigation when the materials were prepared", *Leonen v. Johns–Manville,* 135 F.R.D. 94, 97 (D.N.J.1990). The fact that litigation did in fact occur, *Binks,* 709 F.2d at 1118; *Henderson v. Zurn,* 131 F.R.D. 560, 569 (S.D.Ind.1990), that a party has consulted or retained an attorney, *Henderson,* 131 F.R.D. at 571, 572; *Fine v. Bellefonte Underwriters Insurance Co.,* 91 F.R.D. 420 (S.D.N.Y.1981), that a party has undertaken an investigation, *Taroli v. General Electric Company,* 114 F.R.D. 97, 98 (N.D.Ind.1987), *affirmed without opinion,* 840 F.2d 920 (7th Cir.1988), or engaged in negotiations over the claim, *Hydramar, Inc. v. General Dynamics Corp.,* 115 F.R.D. 147 (E.D.Penn.1986); *Schmidt v. California State Automobile Association,* 127 F.R.D. 182, 184 (D.Nev.1989), is insufficient to establish a reasonable anticipation of litigation under the Rule.

■ *Causation.* Not only must the documents have been produced when litigation was justifiably anticipated, but the material must have been produced *because of* that prospect of litigation and for no other purpose. *Diversified Industries,* 572 F.2d at 604. If documents and materials are produced in the ordinary and regular course of

a party's business, and not to prepare for litigation, they are outside the scope of work product. *See, Advisory Committee Notes to Rule 26(b)(3)* ("Materials assembled in the ordinary course of business or pursuant to public requirements unrelated to litigation, or for other non-litigation purposes are not under the qualified immunity provided by this subdivision."); *Binks,* 709 F.2d at 1119; *Henderson,* 131 F.R.D. at 570. Professors Wright and Miller emphasize this component of the standard immediately following the passage quoted with approval in *Binks:*

> Prudent parties anticipate litigation, and begin preparation prior to the time suit is formally commenced. Thus the test should be whether, in light of the nature of the document and the factual situation in the particular case, the documents can fairly be said to have been prepared or obtained because of the prospect of litigation. *But the converse of this is that even though litigation is already in prospect, there is no work product immunity for documents prepared in the regular course of business rather than for purposes of the litigation.*

8 Wright and Miller, *supra,* § 2024 (emphasis added).

———

■ In *Binks Manufacturing Company v. National Presto Industries, Inc., supra,* a breach of contract case, the Seventh Circuit provided its most extensive recent treatment of the work product standard, primarily through quotations such as this one from *Janicker v. George Washington University,* 94 F.R.D. 648 (D.D.C.1982), on the causation component of the Rule:

> "The mere contingency that litigation may result is not determinative. If in connection with an accident or an event, a business entity in the ordinary course of business conducts an investigation for its own purposes, the resulting investigative report is produceable in civil pre-trial discovery. As stated in *Soeder v. General Dynamics Corp.,* 90 F.R.D. 253 (D.Nev.1980) the distinction between whether defendant's 'in house' report

was prepared in the ordinary course of business or was 'work product' in anticipation of litigation is an important one. The fact that a defendant anticipates the contingency of litigation resulting from an accident or event does not automatically qualify an 'in house' report as work product.... A more or less routine investigation of a possibly resistible claim is not sufficient to immunize an investigative report developed in the ordinary course of business. Some recent cases have suggested the need for objective facts establishing an identifiable resolve to litigate prior to the investigative efforts resulting in the report before the work product doctrine becomes applicable. While litigation need not be imminent, the primary motivating purpose behind the creation of a document or investigative report must be to aid in possible litigation."

*Binks*, 709 F.2d at 1119, quoting *Janicker*, 94 F.R.D. at 650 (internal citations omitted). In the midst of this passage, the court in *Janicker* included an effective example of the level of causation required.

The fact that a defendant anticipates the contingency of litigation resulting from an accident or event does not automatically qualify an "in house" report as work product. In *Soeder, supra*, the Magistrate observed:

"The fact that Defendant anticipates the contingency of litigation following a crash of one of its aircraft does not automatically qualify Defendant's 'in house' report as work product. Certainly litigation is a contingency to be recognized by any aircraft accident. However, given the equally reasonable desire of Defendant to improve its aircraft products, to protect future pilots and passengers of its aircraft, to guard against adverse publicity in connection with such aircraft crashes, and to promote its own economic interests by improving its prospect for future contracts for production of said aircraft, it

can hardly be said that Defendant's 'in house' report is not prepared in the ordinary course of business." 90 F.R.D. at 255.

*Janicker*, 94 F.R.D. at 650. These passages emphasize that the *purpose* for which a party created a document is the fundamental requirement of the Rule, and that when litigation is reasonably anticipated, certain, or even underway, a court must still undertake an examination of *why* a document was produced.

The Seventh Circuit has also declared that it will "not read the 'in anticipation of litigation' requirement broadly," *In re Special September 1978 Grand Jury*, 640 F.2d 49, 65 (7th Cir.1980), and the decision on the facts in *Binks* confirms that this Circuit looks for a very substantial and specific threat of litigation.

In summation, the case law and language of the Rule declare that while a court's identification of a point in time after which litigation is reasonably anticipated is a legitimate and useful exercise, the protection afforded by the work product rule does not depend solely on the fact that a document was produced after that point in time, but depends primarily on the reason or purpose for the documents' production. Even after litigation is justifiably anticipated, routine or ordinary investigations or reports are not work product and may be obtained as normal discovery without a special showing of need. *Pete Rinaldi's*, 123 F.R.D. at 202, n. 4; *see Mission National*, 112 F.R.D. at 163. Both components of the standard must be satisfied: an investigative or evaluative report shown to have been produced for litigation purposes when the prospect of litigation is determined to be remote is not work product, and a report produced at a time when litigation was justifiably anticipated is not work product if the report was produced in the ordinary course of the party's business.[2]

2. The problem of documents produced for concurrent purposes (litigation and non-litigation) is not provided for in the Rule and has not been extensively addressed in the decisions. The

*Binks* quote from *Janicker* included that court's statement that "while litigation need not be imminent, the *primary motivating purpose* behind the creation of the document or investigative

*The insurance context.* An insured seeking documents and reports in his insurer's claims file presents a special problem for application of the work product rule because it is the very nature of an insurer's business to investigate and evaluate the merits of claims. Reports and documents produced for this purpose will likely be relevant to later litigation over a claim as well. This complication affects both the causation and reasonable anticipation components of the work product analysis. Most courts have held that documents constituting any part of a factual inquiry into or evaluation of a claim, undertaken in order to arrive at a claim decision, are produced in the ordinary course of an insurer's business and not work product. *Schmidt,* 127 F.R.D. at 184; *Pete Rinaldi's,* 123 F.R.D. at 202; *Mission National,* 112 F.R.D. at 164 ("The vast majority of the documents submitted under claim of privilege here constitute pure factual investigation of the claim, some of it described as being required by the terms of the policy itself ... such investigation is the 'routine business of an insurance company,'" quoting *Tejada Fashions v. Yasuda Fire*

*and Marine Insurance Co.,* No. 83 Civ. 5512(RO), slip opinion, 1984 WL 500 (S.D.N.Y. June 18, 1984)).

In deciding whether a document constitutes an insurer's work product, however, some decisions have declared that the test is whether the document was generated before or after an insurer's activity shifted from investigation and evaluation of a claim to preparation for litigation, which is determined by when litigation became reasonably anticipated. *See, Taroli,* 114 F.R.D. at 99; *Carver,* 94 F.R.D. at 134. As stated before, however, focusing solely on the point of time when litigation could reasonably have been foreseen ignores the fundamental requirement of the Rule that the documents be produced *because of* the threat of litigation, for the purpose of litigation. The "reasonable anticipation" time limit only narrows the set of documents a court must further examine for causation or motivation. As the court stated in *Schmidt:*

> The majority of cases that have dealt with the issue of whether investigative materials prepared by insurance claims

report must be to aid in possible future litigation," *Binks,* 709 F.2d at 1119 (emphasis added), indicating that whether a document produced for concurrent purposes is work product depends on a determination of which purpose is "primary." Yet in *Janicker's* example (from *Soeder,* quoted above), the plane crash investigation which served two "equally reasonable" purposes of preparing for litigation and, *inter alia,* improving aircraft products and protecting future pilots and passengers, was held to be conducted in the ordinary course of business, suggesting that if non-litigation purposes contributed at all to the motivation behind a document, it is not work product. To the contrary, *Mission National, supra,* suggests that if preparation for litigation formed any part of the motivation for producing a report, it qualifies as work product. 112 F.R.D. at 164 ("To the extent that the purpose of factual investigation and clear trial preparation overlap later in the investigation (after July 3, 1985) [the date the court found litigation could reasonably be anticipated], however, the issue is a different one—namely whether a substantial need has been shown for overcoming the privilege").

The purpose of the work product rule is to protect the vitality and efficacy of the adversarial process of litigation by preventing an opposing party from "co-opting the wits" of his adversary and by providing an environment of priva-

cy in which a litigator may creatively develop his strategy and tactics without fear of premature discovery. *Hickman v. Taylor, supra.* As stated before, the Seventh Circuit has indicated that the work product rule should not be given a broad scope, and it is an axiom that any privilege or rule that inhibits the free and open discovery intended by the Federal Rules should be narrowly construed. It is an obvious fact that many investigations and reports produced for non-litigation purposes also serve litigation ends as well. Because the work product rule does not prevent discovery of documents prepared for non-litigation purposes, it would be an unwarranted extension of that rule to prevent access to such a broad range of documents merely because of the inherent importance of such documents to several interests, one of which happens to be litigation. The danger is surely slight that release of a document that is produced in the ordinary and regular course of a party's business would reveal damaging litigation strategy of that party simply because such a document may also be helpful in litigation.

Documents prepared for concurrent purposes, therefore, should not be classified as work product. Such an approach is consistent with the purposes of the work product rule and avoids the impossibility of weighing the asserted motives behind the creation of a document to determine which one is primary.

adjusters is work-product prepared in anticipation of litigation have held that since insurance companies have a routine duty to investigate accidents, such materials are not prepared in anticipation of litigation but are prepared in the ordinary course of business absent unique circumstances showing the contrary.... The connection to possible litigation of the material being prepared must be sufficiently concrete so as to provide assurance that the routine claims processing material prepared in the ordinary course of the insurance business will not be immunized from discovery.

*Schmidt,* 127 F.R.D. at 184. *See also Pete Rinaldi's,* 123 F.R.D. at 202 ("An insurance company cannot reasonably argue that the entirety of its claims files are accumulated in anticipation of litigation when it has a duty to investigate, evaluate and make a decision with respect to claims made on it by its insured.").

Courts have employed practical presumptions in their analyses which reflect the realities of the insurance business, prior experience, and common sense. The court in *Pete Rinaldi's,* for instance, declared:

Because an insurance company has a duty in the ordinary course of business to investigate and evaluate claims made by its insured, the claims files containing such documents usually cannot be entitled to work product protection. Normally, only after the insurance company makes a decision with respect to the claim, will it be possible for there to arise a reasonable threat of litigation so that information gathered thereafter might be said to be acquired in anticipation of litigation. *APL v. Aetna Cas. & Sur. Co.,* 91 F.R.D. 10 (D.Md.1980)—(fidelity policy). This is not to say that the threat of litigation may never arise at an earlier time. However, if the insurer argues it acted in anticipation of litigation before it

formally denied the claim, it bears the burden of persuasion by presenting specific evidentiary proof of objective facts demonstrating a resolve to litigate.

*Id. See also, Schmidt,* 127 F.R.D. at 184; *Airheart,* 128 F.R.D. at 671. Neither experience nor reason, however, suggest that post-anticipation investigation or evaluation of incidents is so rare as to justify a court's employing such a presumption to excuse a party's burden of proving causation or use. *See Mission National,* 112 F.R.D. at 163 ("Some degree of pure claims investigation continued past that date [when litigation was reasonably contemplated]"); *Pete Rinaldi's,* 123 F.R.D. at 202, n. 4.

─────────

 Based on this review of the law, the Court concludes that *Fed.R.Civ.P.* 26(b)(3) requires that a document or thing produced or used[3] by an insurer to evaluate an insured's claim in order to arrive at a claims decision in the ordinary and regular course of business is not work product regardless of the fact that it was produced after litigation was reasonably anticipated. It is presumed that a document or thing prepared before a final decision was reached on an insured's claim, and which constitutes part of the factual inquiry into or evaluation of that claim, was prepared in the ordinary and routine course of the insurer's business of claim determination and is not work product. Likewise, anticipation of litigation is presumed unreasonable under the Rule before a final decision is reached on the claim. The converse, of course, is presumed for documents produced after claims denial. To overcome these presumptions, the insurer must demonstrate, by specific evidentiary proof of objective facts, that a reasonable anticipation of litigation existed when the document was produced, and that the document was prepared and used solely to prepare for

---

**3.** A report produced to prepare for litigation, but used, in fact, to assist in the investigation or evaluation of a claim in the ordinary course of business, should be treated as if its creation were actually so motivated. Such an approach best comports with the purpose of the work product rule and best reflects the realities of insurance practice while avoiding difficult and unnecessary evidentiary disputes over intangible motivations and uses, and eliminating a possible incentive for obstructionist assertions.

that litigation, and not to arrive at a (or buttress a tentative) claim decision.[4]

 When a privilege or immunity is asserted with respect to documents, this Magistrate Judge follows the better practice of requiring the resisting party to submit to the Court and to the requesting party at the time of objection a detailed "Vaughn Index" of the documents. *See, Vaughn v. Rosen,* 484 F.2d 820 (D.C.Cir. 1973). This index must list, for each separate document, the authors and their capacities, the recipients (including copy recipients) and their capacities, the subject matter of the document, the purpose for its production, and a detailed, specific explanation of why the document is privileged or immune from discovery. This last explanation must include a comprehensive presentation of all factual grounds and legal analyses in a non-conclusory fashion. After the Court has reviewed the index and considered the arguments of counsel, it may order the documents submitted for *in camera* review. The court in *Burr v. United Farm Bureau Mutual Insurance Company,* 560 N.E.2d 1250, 1255 (Ind.App. 1990), well-stated the process:

> [The party asserting a privilege] is required to assert its claim of the work product privilege on a document by document basis and may not rely upon a blanket claim of privilege for all documents contained in its file. *Taroli, supra.* Submitting a voluminous batch of

documents for *in camera* review does not satisfy a proponent's burden of establishing some or all of the documents deserve work product protection. *Pete Rinaldi's, supra,* at 203. In cases involving large numbers of documents or where the nature of the document will not likely be readily apparent on its face to the uninitiated observer, the proponent of the work product protection must present the matter *in camera* to the court in a reviewable form which itemizes each document, provides a factual summary of its contents, and justification for withholding it. *Id., see Delaney, Migdail & Young, Chartered v. I.R.S.* (D.C.Cir.1987), 826 F.2d 124, 128. To supplement the rule in *Petersen [v. U.S. Reduction,* 547 N.E.2d 860 (Ind.App. 1989)] *infra,* we imposed the additional requirement the *in camera* disclosure in work product matters must be so complete and understandable the trial court need not (but may at its option) do any further research or review of other papers on the subject to clarify anomalous language contained in counsel's disclosing document. If such disclosure does not speak with the utmost clarity, the trial court may in the exercise of sound discretion reject it and deny the requested protection out of hand in the interests of judicial economy.

(footnote omitted).[5] Overcoming the presumptions that, before a claim decision is made, litigation is not anticipated and in-

---

4. Defining precisely what an adequate showing would consist of is best left to case-by-case development. The factors determining a reasonable anticipation of litigation are already well-developed in the case law. Without attempting a comprehensive list, an insurer seeking to overcome the second presumption and convince a court that documents and things produced prior to a claims decision were produced or used solely for litigation purposes could show, for example, that reliable and convincing evidence established the existence of all elements necessary for a good faith claims denial such that it was improbable that any reasonably foreseeable results of later investigations would change that decision (and that only bureaucratic process delayed a final decision) or he could show a complete segregation of the subject documents from the insurer's claims evaluators and decision-makers (*e.g.,* the insurer's counsel ordered

the investigations and the results remained isolated in the legal department). In the former instance, most of the evidence would unavoidably be duplicative of the evidence for the insurer's case in chief.

5. *Burr's* approach differs somewhat from the procedure outlined by the Court. First, the documents need not be submitted for *in camera* review immediately upon assertion of a privilege or immunity. However, contemporaneous with the assertion of the privilege or immunity, the "Vaughn Index" should be submitted. A second difference is that the "Vaughn Index" must be served on the requesting party as well. This will allow the requesting party to better present his argument to the Court and may permit him to weed out certain document requests that the Index itself reveals are not germane or obviously privileged.

vestigative/evaluative documents are not produced or used for litigation, requires a showing of specific evidence of objective facts ordinarily by affidavits or other evidence beyond the documents themselves. *See Pete Rinaldi's,* 123 F.R.D. at 203.

*Facts of the present case.* In this case, Auto–Owners asserts that because it anticipated litigation on the date of the fire, February 1, 1987,[6] all documents produced thereafter are protected as work product. The scope is total—the entire claims file and every document and thing prepared by Auto–Owners related to the plaintiff's claim is asserted to be immune from discovery.

■ Auto–Owners recorded a decision to deny the plaintiff's claim on April 3, 1987 but it was not until April 14th that a denial notice was sent. Because Auto–Owners had not effectively taken final action with respect to the plaintiff on April 3rd, but could have changed its decision any time before a denial notice was sent (perhaps in response to further investigation or re-evaluation), and not wanting to encourage insurers to record early denials with suspended notification as a means of reaping discovery benefits, the Court finds that a final decision on the plaintiff's claim was not reached until notice was sent on April 14, 1987. According to the approach set forth above, therefore, absent a strong showing to the contrary, the Court presumes that litigation was not reasonably anticipated before April 14th and that all reports, investigations, and documents produced before this time which comprise any part of a factual inquiry or evaluation of the plaintiff's claim were prepared for the purpose of reaching a final decision on the claim in the ordinary course of business and, thus, not work product. The question is whether Auto–Owners has overcome

these presumptions by presenting specific evidentiary proof of objective facts to the contrary. For the reasons given below, the Court finds that it has not successfully carried its burden and overrules its work product objections to the discovery of its documents and things produced between February 1, 1987 and April 14, 1987.

■ Auto–Owners' evidentiary showing consists of the two fire department Incident Reports completed the day of the fire which describe the fire at the plaintiff's business as incendiary in origin,[7] and an affidavit by Robert U. Winters, the Indianapolis Branch Claims Manager for Auto–Owners, explaining why the arson label in these two reports justifies Auto–Owners' position. Because it comprises the bulk of Auto–Owners' evidentiary showing, Mr. Winters' affidavit is set out in full:

1. I am currently the Indianapolis Branch Claims Manager for Auto–Owners (Mutual) Insurance Company.

2. As Branch Claims Manager, I have responsibility for supervising and maintaining all files and correspondence relevant to the claims brought by Harry T. Harper for fire loss to Best Body Shop. Auto–Owners was made aware of the loss on February 1, 1987, and was informed of the incendiary nature of the fire by the local fire department on February 2, 1987.

3. *Based upon this information from the fire department, the company anticipated litigation with its insured* and employed L & H Investigations on February 2, 1987, to conduct a cause and origin investigation. Thereafter, on February 3, 1987, Auto–Owners employed Insurance Investigation Specialists to do

---

6. In its briefs and its claims manager's affidavit, Auto–Owners stated that it first anticipated litigation the day after the fire. At the hearing on the present motion, however, it stated that it assumed a litigation posture the day of the fire when it received word of the fire department's arson finding.

7. The two reports generated by the Mooresville, Indiana Fire Department are dated February 1, 1987, the date of the fire. The first is a one-

page internal department Incident Report which gives the "Cause Apparent" as "Set/Arson". The other is an Indiana Department of Fire Prevention and Building Safety, Fire Incident Reporting System, Incident Report which identifies the "Ignition Factor (Cause)" as "Incendiary". Neither the bases for these findings nor any other information on cause or origin appears in these Reports.

a background investigation of the insured's finances.

4. On February 6, 1987, Auto–Owners employed the law firm of Jennings & Maas to monitor the claim of Harry T. Harper, III, to comply with the requirements of the Indiana Arson Reporting Act on behalf of Auto–Owners and to conduct the examinations under oath of Harry T. and Paralee Harper.

5. Auto–Owners' records reflect that, for the period 1985 to 1988, during which time the Harper fire occurred, the company received 694 claims for fire loss in Indiana south of Interstate 70, only 39 of which involved incendiary fires.

6. In the case of accidental fires, the company does not ordinarily employ experts or counsel but adjusts the loss by evaluating the extent of damages and the amount due under the policy.

7. *Because of the nature of arson fires and the potential of profit to an insured, it is Auto–Owners' company policy in the case of an incendiary loss to employ experts and counsel in anticipation of litigation of an insured's claim. Auto–Owners' investigation of an incendiary fire claim is not conducted in the ordinary course of its business relating to fire claims, but is a specialized investigation carried on after the company has been made aware of the possibility of litigation with its insured.*

8. Auto–Owners' investigation of Harry T. Harper's claim for fire loss at Best Body Shop was conducted in anticipation of litigation after February 2, 1987, the day upon which the company learned of the incendiary nature of the Best Body Shop fire.

(emphases added and document cites omitted). Thus, Auto–Owners asserts that because of the "nature" of arson—its rarity and potential as a vehicle for fraud—the bare notice from the fire department that the fire was incendiary presented enough of a threat of litigation from its insured that it reasonably acted in anticipation thereof. Further, it asserts that this nature of arson together with Auto–Owners' policy of intensive arson investigations,

demonstrates that it acted only to prepare for litigation from the day of the fire onward. Both assertions are rejected.

First, the nature of arson is not so compelling as to establish, on the sole basis of a simple "arson" finding by a fire department, a reasonable anticipation of litigation or a reasonable excuse for not investigating or evaluating the claim further in order to arrive at a justifiable claims decision existed. The only evidence presented to the Court on this point is Mr. Winter's passing reference to the "nature of arson": its potential for profit to an insured, and the fact that few of Auto–Owners' claims are arson related (only about 5.6 percent of the fire claims received by Auto–Owners south of interstate 70 from 1985 to 1988 involved arson).

It is uncertain how representative Auto–Owners' statistics are to arson fires generally or how relevant an overall number is to the plaintiff's commercial property case.

> In one recent year, the U.S. Fire Administration listed arson as the cause of almost one in every four fires in non-residential structures, including schools, restaurants, garages, and manufacturing plants....

> This is not to say that every arson is committed so that the insured can "sell" distressed property to the insurance company—a situation known as "arson for profit".

1 Rodda, Trieschmann, Wiening, and Hedges, *Commercial Property Risk Management and Insurance* 153, American Institute for Property and Liability Underwriters, Malvern, Pennsylvania. 3rd ed. 1988. One study revealed that arson accounts for 27 percent of the total number of, and 37 percent of the total dollar loss from, commercial coverage fires in the voluntary market. It accounts for 40 percent of the number of, and 52 percent of the dollar loss in, the commercial F.A.I.R. plan market. *Arson Incidence Claim Study*, All–Industry Research Advisory Council, Table 4, March 1982. Such statistics do not suggest a rare incidence of arson for the plaintiff's type of insured property.

Yet, whether arson fires are rare or common is largely irrelevant to the reasonableness of an insurer's anticipation of litigation or its need to investigate an insured's claim. Incendiary or arson fires "are fires in which 'legal decision or physical evidence indicates that the fire was deliberately set.'" *See*, Timothy J. Flanagan and Kathleen Maguire, eds., *Sourcebook of Criminal Justice Statistics—1989*, U.S. Department of Justice, Bureau of Justice Statistics, Washington, D.C.: U.S.G.P.O., 1990. Yet the fact that a fire was deliberately set is not even half the picture for an insurer. Whether its insured set the fire is the essential element and, in the absence of other evidence, the nature of arson claims is such that he probably did not. Arson fires are set by owners and non-owners for many reasons: revenge, concealment of other crime, mental deficiency, vandalism, pyromania, and fraud (arson-for-profit) being the major motives.[8] Statistics and information in this area are extremely difficult to come by and the Court was not presented with much by the parties. A report produced by an insurance industry research council, containing the most recent compilation of such statistics the Court discovered, indicates that of all arson motives, "arson fraud" (arsons set by insureds to collect insurance proceeds) accounts for only twelve (12) percent of the total number of commercial property arson fires and eight (8) percent of the monetary value of commercial property arson damage and loss. *Arson Incidence Claim Study*, All–Industry Research Advisory Council, p. 11 and Table 10, March 1982.[9] These figures affirm the common sense (and the experience of the undersigned Magistrate Judge) that a preliminary outside finding of arson standing alone does not reasonably indicate the insured owner as the cause. On the day of the fire, when Auto–Owners claims it assumed a litigation posture, it had no information before it except the local fire department's finding of arson set forth in the two labels "Set/Arson" and "Incendiary". Because the arsonist was unknown, and the incidence of insurance fraud as a cause of arsons indicates that it was far from likely that the plaintiff was the cause, it was unreasonable for Auto–Owners to have acted in anticipation of litigation at that time. Likewise, it is unreasonable to conclude that the subsequent investigations and evaluations were irrelevant to Auto–Owners' decision on the plaintiff's claim.

Secondly, even if Auto–Owners could have reasonably anticipated litigation the day of the fire on some other basis (*e.g.*, suit threatened or filed), it has failed to establish, by specific evidence of objective facts, that each requested document was created and used solely to prepare for that litigation. Auto–Owners' showing consists

**8.** These, and "unknown", are the categories used by the Indiana Department of Fire and Building Services and the Indiana State Fire Marshal's office in classifying arson motives for the statistics they compile. *See also, Arson Incidence Claim Study*, p. 1 and Table 10, All–Industry Research Advisory Council [an insurance industry research group], March 1982 (motives used in classifying arson: Arson Fraud, Vandalism, Revenge, Concealment, Pyromania, Other).

**9.** The results for all motives:

**Arson Fire Motive Voluntary Market ***

| Coverage:<br>Motive: | Residential | | Commercial | |
|---|---|---|---|---|
| | Number(%) | Dollar(%) | Number(%) | Dollar(%) |
| Arson Fraud | 14 | 22 | 12 | 8 |
| Vandalism | 53 | 40 | 49 | 61 |
| Revenge | 12 | 12 | 11 | 6 |
| Concealment | 6 | 8 | 8 | 6 |
| Pyromania | 3 | 3 | 3 | 5 |
| Other | 13 | 15 | 16 | 15 |

* "The FAIR Plans were remarkably consistent in the proportion of claims reported to be arson. However, with regard to arson motive their breakdowns ranged from extremely high in one FAIR Plan to zero in others. Because averages developed from such figures would be without meaning, no FAIR Plan motive averages are presented."

From Table 10, *Arson Incidence Claim Study*.

of Mr. Winter's affidavit stating that, because of the nature of arson fires, Auto–Owners conducts a specialized investigation and evaluation of arson loss claims. It has already been held above that when the facts show only a bare finding of arson by a fire department, an allegation of the nature of arson fires is insufficient to overcome the reasonable presumption that Auto–Owners undertook or used subsequent investigations to arrive at its claims decision. Auto–Owners, however, relies on another argument: because its established policy is to undertake the more intensive investigations employed in this case only in the rare instances of arson losses and not for the more common accidental fires, they do not constitute the ordinary and usual course of its business, and therefore should be considered as work product. Auto–Owners misses the mark in its distinctions between specialized and routine courses of business. Mr. Winters' affidavit actually shows that Auto–Owners' routine and ordinary course of business with an arson claim is to conduct a "specialized" investigation. A process that has become a company "policy" and is undertaken as a matter of course is that company's routine. What is important in the work product context, however, is whether this routine process is part of the business of the company (in this case, providing insurance coverage and processing claims) or is compelled by litigation needs. A company may pursue its litigation in an ordinary and routine manner as well as undertake an unusual or specialized business activity for non-litigation purposes. The key is whether Auto–Owners' "specialized" investigations were undertaken to arrive at a claims decision, or solely to prepare for litigation, and Mr. Winters fails to make this crucial allegation in his affidavit. He states that the specialized investigations are conducted "after the company has been made aware of the possibility of litigation with its insured", and that the actual investigation into the plaintiff's claim was "conducted in anticipation of litigation." He does not say that these investigations were undertaken and used solely to prepare for litigation. A more intensive investigation may be conducted by an insurer in arson cases or when it is informed of the possibility of litigation in order that it will have a higher level of confidence in its final claims decision—a non-litigation motivation. In addition, part of the nature of arson fires is that they are extremely difficult to investigate because of the destruction of evidence. Thus, a more specialized or intensive investigation would also be called for in arson cases simply to arrive at a normal, reliable claims decision, regardless of the prospect of litigation. Merely alleging that more intensive investigations are conducted for arsons because of the possibility of fraud or litigation or the difficulty of determining the facts, is not enough under the Rule. It must be alleged and shown that the reason for undertaking the investigation, and the use to which the results were put, was solely for to prepare for litigation, and not, even in part, for any of the other natural and presumed reasons for such investigations. Auto–Owners has not so alleged or shown in this case.

Auto–Owners was under a contractual obligation to make a determination on the plaintiff's claim. At the time of the fire, no investigation into cause and origin or the background of the plaintiff had been conducted, and no significant internal deliberations or significant contacts with the plaintiff are evident. By its own admission, Auto–Owners did not make a denial decision until April 3rd. It would strain credibility to assert that none of the post-fire investigations were ordered for or had any influence on that decision. In essence, Auto–Owners asks this Court to find that on the day of the fire it had sufficient grounds, in the fire department's "Set/arson" and "Incendiary" labels alone, to deny coverage on the plaintiff's claim without further inquiry or consideration. Clearly, such a finding would be unwarranted and the Court doesn't understand Auto–Owners to be making such an argument at this time. It is obvious to the Court that the presumption that Auto–Owners. undertook further investigations into the fire and relied on the results thereof to deny the plaintiff's claim remains unrefuted. At the hearing, Auto–Owners sought to support

its argument that litigation was reasonably anticipated on the day of the fire by pointing to the results of its later investigations which, it claims, established the "arson triangle" [10] of evidence indicating the plaintiff as the perpetrator.[11] This is mere hindsight. While the results of these investigations, occurring as they did after, sometimes well after, the date of the fire, are obviously irrelevant to the issue of whether Auto–Owners reasonably anticipated litigation on the date of the fire or that all documents produced thereafter were for litigation purposes, they *do* demonstrate the necessity after the fire for further investigation in order to gather the facts needed to deny the plaintiff's claim.[12]

Auto–Owners relies primarily on the decision in *Carver v. Allstate Insurance Company, supra,* another arson insurance case. In that case, the initial investigation into the fire loss was conducted by a claims adjuster from July 1 through August 26, 1981. Because of a claim adjuster's report on suspicious circumstances surrounding the origin of the fire, a similar report by outside experts, and the substantial monetary loss involved, the insurer assigned the case to a senior claims representative for further investigation.[13] The court held

that when the case was transferred to the senior representative, litigation was reasonably anticipated because "management had indications that the fire was the result of arson committed by or under the direction of the plaintiff [the insured]."

Because insurance companies investigate claims as part of their regular business, but with an eye to litigation at the same time, the court saw the work product rule as creating a dilemma for the courts: protect all insurance company investigatory reports, thus unduly increasing the costs of litigation, or open all claims files for inspection, thus inhibiting the candor and reliability of investigator/adjustor evaluations and allowing plaintiffs to acquire the litigation strategy of the insurance company. The court found the solution to this dilemma in the process of claims evaluation:

> At some point, however, an insurance company's activity shifts from mere claims evaluation to a strong anticipation of litigation. This is the point where the probability of litigating the claim is substantial and imminent. The point is not fixed, it varies depending on the nature of the claim, and the type of investigation conducted. The decision whether in-

---

**10.** A standard approach to arson investigation which seeks to identify the arson setter by establishing the three sides of the triangle: 1) cause and origin, 2) opportunity, and 3) motivation.

**11.** Auto–Owners conducted a cause and origin investigation, a personal and financial background check on the plaintiff, and took sworn statements of the plaintiff and his wife. It eventually decided to deny the plaintiff's claim for six reasons: first, arson: the plaintiff burned or ordered the burning of the insured property; second, false swearing: the plaintiff made false statements in his sworn statement and proof of loss; third, fraud: the plaintiff "knowingly and intentionally made false or misleading statements in his application for this insurance with Auto–Owners with an intent to obtain the benefit of coverage ..." and the plaintiff's sworn statement and proof of loss contained fraudulent misrepresentations; fourth, misrepresentation: the plaintiff's sworn statement and proof of loss contained fraudulent misrepresentations; fifth, intentional concealment in the plaintiff's sworn statement and proof of loss; and sixth, insufficient proof of claimed amounts. (Contentions of Defendant and Third Party Plaintiff, Auto–Owners Insurance Company; April 14, 1987 letter from Auto–Owners notifying the

plaintiff of the denial of his claim). The last five reasons for Auto–Owners' denying the claim depended entirely on investigations and fact-gathering after the date of the fire (the examination under oath took place on March 16, 1987). It is only the first reason that Auto–Owners attempts to establish as a basis for its anticipation of litigation on the date of the fire and as proof that it neither ordered nor used subsequent investigations to evaluate the claim. Yet while evidence existed at that time that arson was the cause of the fire, there was insufficient, in fact no, evidence that the plaintiff "burned, or procured to have burned, the property...."

**12.** Auto–Owners does not allege any threat of litigation from the plaintiff or any contacts with his attorney which would account for their anticipation of litigation. Apparently the question of concurrent purposes behind the creation of the documents is not presented in this case as Auto–Owners does not make that assertion—it argues that *no* documents or investigations were ordered or used to evaluate the claim, but only to prepare for litigation.

**13.** Neither the date of the fire nor the date of denial are given.

670

surance company investigatory documents were "prepared in anticipation of litigation" turns, therefore, on the facts of each case.

94 F.R.D. at 134. Applying this approach to the facts of the case, the court held:

These facts indicate to the Court that when Allstate's investigation of the plaintiff's fire loss was assigned to John Palmer [the senior claims representative], he conducted the investigation in anticipation of litigation, and all documents emanating therefrom were "prepared in anticipation of litigation" as prerequired by Rule 26(b)(3). First, claims for fire loss, unlike other types of property loss, can more easily be cloaked in fraudulent or criminal conduct, and engender more wariness from insurance companies at the time of filing. Second, in the instant case, prior to Palmer's involvement, initial wariness was fortified by detailed suspicions from both in-house and independent investigators. Third, Palmer was assigned to continue the investigation precisely because of the suspicious conduct that Allstate believed it had uncovered. The Court thinks that at this point in the investigation, the likelihood that litigation would ensue was substantial, and Palmer conducted his investigation with the knowledge of this probability and the collateral likelihood that his reports would be used in the eventual litigation.

94 F.R.D. at 135.

First, it should be noted that *Carver* differs significantly from this case on the facts in that the insurer in *Carver* had undertaken some investigation and was thus able to make more of a showing that it reasonably anticipated litigation before denying the claim.[14] Here, Auto–Owners claims work product immunity before *any* investigations or evaluations were even started. However, because Auto–Owners argues for the same result as in *Carver* (a finding that the insurer produced work product prior to claims denial) and the same rule of decision to arrive there, the Court will further examine *Carver*'s approach to work product analysis.

The Court disagrees with the *Carver* court's view that insurance reports present a dilemma for application of the work product rule. The rule requires a cause, purpose, or motivation relationship between the production of an insurer's documents and the anticipation of litigation. An insurance company's assertions that all of its undertakings are work product presents less a dilemma and more of only a proof problem.[15] Courts have addressed this difficulty partly by developing the body of "reasonable anticipation" guidelines to limit such assertions to times of substantial and imminent threats of litigation. The remaining difficulty is distinguishing whether a particular report was produced for the purpose of preparing for litigation or for the purpose of evaluating the claim, when both motivations may reasonably occur at the same time.

By finding the solution to its dilemma in a pivotal time when the insurer's activity "shifted" from claims evaluation to preparation for litigation, the *Carver* court again overlooked the Rule's requirement of a causation relationship between the documents' production or use and the impending litiga-

14. Presumably, this additional information included indications that the insured was the arson perpetrator.

15. The Court does not agree that application of the work product rule presents the need to balance the interests of full discovery of insurer documents against full protection. All that is required is determining the motives behind the creation of the documents. The Rule itself has already set the balance between the benefits to a litigator's (or party's) work of privacy and the benefits to an opponent of full discovery (and the benefits to the process as a whole of both): material is undiscoverable only if it is produced and used solely for litigation purposes, and then only if no substantial need for the materials is shown. At any rate, the *Carver* court's assumption that full discovery necessarily inhibits the candor and reliability of internally generated reports is far from certain. *See, Kelly v. City of San Jose,* 114 F.R.D. 653 (N.D.Cal.1987) (finding that the candor and accuracy of witness and officer statements during internal police department investigations are actually enhanced by the known possibility of disclosure in later litigation). This Court will not venture to extend work product protections or set a new balance of interests not provided for in the Rule.

tion. The Rule requires a court to pursue such an inquiry into each document for which the immunity is claimed and places the burden of proof on the insurer. By not requiring the insurer to show why documents were prepared, or how they were used, but only when they were produced, the *Carver* court, as other courts have, employed presumptions which are unrealistic, unreasonable, and in contravention of the clear mandate of the Rule.[16]

---

The documents for which Auto–Owners objects to production on the basis of the work product immunity, and which were prepared prior to April 14, 1987, are ordered produced within ten days of receipt of this order. Auto–Owners has failed to successfully carry its burden of establishing that these documents were prepared and used solely for litigation purposes. The documents and reports produced after April 14, 1987 are presumed to have been produced in reasonable anticipation of litigation, and such appears from a review of the documents *in camera*. The plaintiff has failed to make the required showing of substantial need for these documents or the inability to obtain the substantial equivalent as required by the Rule. The specific document rulings are set out below.

### B. Attorney–Client Privilege.

A party asserting the attorney-client privilege must show:

(1) the asserted holder of the privilege is or sought to become a client; (2) the person to whom the communication was made (a) is a member of the bar of a court, or his subordinate and (b) in connection with this communication is acting as a lawyer; (3) the communication relates to a fact of which the attorney was informed (a) by his client (b) without the presence of strangers (c) for the purpose of securing primarily either (i) an opinion on law or (ii) legal services or (iii) assistance in some legal proceeding, and not (d) for the purpose of committing a crime or tort; and (4) the privilege has been (a) claimed and (b) not waived by the client.

*Diversified Industries, Inc. v. Meredith,* 572 F.2d 596, 601–02 (8th Cir.1977), citing *United States v. United Shoe Machinery Corp.,* 89 F.Supp. 357, 358–59 (D.Mass. 1950), quoted in *Mission National,* 112 F.R.D. at 162. Specific rulings on assertion of the privilege are set out below. Auto–Owners asserts the privilege for all documents addressed to or sent by its counsel (in-house or outside). Outside counsel was hired five days after the fire to monitor the progress of the case, ensure compliance with the Indiana arson reporting requirements, and conduct the examination under oath of the plaintiff and his wife as provided in the policy. (Affidavit of Robert U. Winters). To the extent that this attorney acted as a claims adjuster, claims process supervisor, or claim investigation monitor, and not as a legal adviser, the attorney-client privilege would not apply. *See Mission National,* 112 F.R.D. at 163.

### C. Expert Facts and Opinions.

Auto–Owners asserts protection for some of the subject documents on the basis of *Fed.R.Civ.P.* 26(b)(4) (often on the basis of the similar Indiana Trial Rule 26). Like the attorney/party work product rule, *Fed.R.Civ.P.* 26(b)(3), the expert work product rule requires that the document be "acquired or developed in anticipation of litigation or for trial." Consequently the analyses and decisions on this assertion of privilege parallel those made for attorney/party

**16.** It should also be noted that the *Carver* court's reason for finding a reasonable anticipation of litigation in the fact that "claims for fire loss, unlike other types of property loss, can more easily be cloaked in fraudulent or criminal conduct, and engender more wariness from insurance companies at the time of filing", merely shows the added difficulty of making an evaluation of an insured's claim in arson cases. Difficulty of investigation and evaluation alone, especially in view of the nature of arson claims discussed above, does not reasonably lead an insurer to anticipate litigation or excuse an insurer from undertaking an investigation and evaluation of its insured's claim. Presumably proof difficulties arise in claims for embezzlement, theft, or other such losses. Difficulty in gathering evidence or otherwise evaluating a claim would not appear to be a legitimate reason, under the Rule, to prevent discovery of documents.

work product above and are set forth below.

### D. Production Orders.

IT IS THEREFORE ORDERED:

The following documents shall be produced within ten days of receipt of this order:

1—[Notice to Auto–Owners to cancel policy on different business located in plaintiff's building because the business was destroyed in the fire. The defendant asserts work product immunity.] Reason: this document was produced in the ordinary course of business.

2 and 3—[Memoranda on cancellation of policy referred to in document 1. Asserts work product immunity.] Produced in the ordinary course of business.

4, 5, and 6—[Transmittal letters. Asserts attorney-client privilege.] Not sent for the purpose of obtaining legal assistance.

7, 8, 9—[Invoices and statements from outside experts for investigations performed. Asserts work product and expert knowledge (Rule 26(B)(4)) immunities.] Ordinary and routine business documents, not produced for litigation purposes.

10—[Report of test samples. Asserts Indiana Trial Rule 26(B)(4)(a)(i) and (ii) protection and work product.] Indiana Trial Rules inapplicable in federal court; these documents were produced in the ordinary course of business for claim evaluation.

11 and 12—[Time and expense logs of investigators. Asserts Indiana Trial Rule 26(B)(4) protection for work product.] Indiana Trial Rules inapplicable in federal court; these are ordinary and routine business documents.

13—[Report of investigation results sent to attorney employed by Auto–Owners. Asserts expert work product under Indiana Trial Rule 26(B)(4)(b) and attorney work product.] Indiana Trial Rules inapplicable in federal court; this document was produced in the ordinary course of business for claim evaluation; and the attorney was not acting as an attorney but as a claims process supervisor at this time.

14—[Appears to be electronic message request for copy of insured's policy. Asserts work product immunity.] This is an ordinary and routine business document.

16—[3 parts: 1) transmittal letter, 2) letter from Auto–Owners' Indianapolis Claims Manager to the Home Office on S.B.A.'s and contract seller's interest in property, 3) memo from Auto–Owners to contract seller. Asserts attorney-client privilege.] Part 1): not sent to obtain legal advice; part 2) not privileged as attorney-client communication because it is an internal memo with copy only sent to attorney; 3) communication sent from Auto–Owners to outside third party and not to attorney seeking legal advice.

17—[Letter from attorney to Auto–Owners transmitting invoice for transcript of plaintiff's sworn statements, and the invoice. Asserts attorney-client privilege and, at hearing, relevancy objection.] Not attorney-client because merely a transmittal letter and not seeking or giving legal advice; relevant to costs incurred and activity undertaken before denial of claim.

20—[Internal Auto–Owners memo memorializing decision to deny claim. Asserts work product immunity.] Produced in the ordinary and regular business of claim evaluation.

26—[Transmittal letter to Auto–Owners from its attorney, transmitting report of investigation and invoice for payment. Asserts attorney-client privilege.] This document was not sent to obtain or transmit legal advice; attorney was acting as a claims process supervisor at this time.

27—[Time and expense logs of investigator company, and report, dated April 14, 1987, of results of investigation into the plaintiff's background. Asserts expert work product protected under Indiana Trial Rule 26(B)(4)(b).] Time and expense logs are routine, ordinary business documents not pre-

pared for litigation purposes. Indiana Trial Rules are inapplicable in federal court. Report of investigation was prepared in the ordinary and regular course of business of claim evaluation.

28—[Statement of costs of investigation. Asserts expert work product immunity under Indiana Trial Rule 26(B)(4)(b).] Indiana Trial Rules are inapplicable in federal court. This is a routine, ordinary business document not produced to prepare for litigation.

39—[Report of cause and origin investigation. Asserts expert work product immunity under Indiana Trial Rule 26(B)(4)(b).] Indiana Trial Rules are inapplicable in federal court. This document was produced in the ordinary and regular course of business of claim evaluation.

40—[Letter from investigator to Auto–Owners containing future investigation plans and some results of investigations to date. Asserts work product immunity.] This document was produced in the ordinary and regular course of business of claim evaluation.

42—[Transmittal letter from Auto–Owners to its attorney. Asserts attorney-client privilege.] This letter is only a transmittal letter and was not sent to solicit or give legal advice.

43—[Note from Auto–Owners' home office to Indianapolis branch office directing sending of file to attorney. Assert attorney-client privilege.] This communication was not to an attorney or his subordinate, and was not sent to solicit or give legal advice.

44—[Letter from Auto–Owners' branch office to home office informing of hiring of attorney and ordering of investigations. Assert attorney-client privilege.] This communication is not to an attorney or his subordinate, and was not sent to solicit or give legal advice.

45—[Transmittal letter from Auto–Owners to its attorney. Asserts attorney-client privilege.] This letter was not sent to solicit or give legal advice. At this time, the attorney was acting as a claims process supervisor.

47—[Auto–Owners' contact record which logs activity on the plaintiff's claim. Asserts attorney-client privilege.] This document was not created to solicit or give legal advice and was not directed to an attorney or his subordinate. At this time the attorney was acting as a claims process supervisor.

51—[Auto–Owners' contact record which logs activity on the plaintiff's claim. Asserts work product immunity.] This is an ordinary and routine business document, not created to prepare for litigation.

52—[Memo to file by Auto–Owners' in-house attorney. Asserts attorney-client privilege.] This memo was not produced to solicit or give legal advice; relevant to Auto–Owners' activity on the claim.

53 through 59—[Copies of previous documents.]

60—[Transmittal letter from Auto–Owners' outside counsel to Mooresville Fire Department transmitting sworn statements of plaintiff and wife in compliance with Indiana Arson Reporting Act. Asserts only that document is marked "Privileged and Confidential" by the attorney.] No privilege asserted. This document was not prepared to solicit or give legal advice.

64—[Transmittal memo. Asserts attorney-client privilege.] This memo was not sent to solicit or give legal advice. At this time, the attorney was acting as a claims process supervisor.

The following documents shall not be produced for the reasons given:

15—[Letter to Auto–Owners from its outside counsel summarizing examinations under oath of the plaintiff and his wife. Asserts privilege because contains mental impressions of attorney.] This document falls under the attorney-client privilege. It includes mental impressions of Auto–Owners' attorney on legal matters while he was acting as an attorney and not a claims process supervisor.

18 and 19—[Letter (and copy) to Auto–Owners from its outside counsel re-

garding the plaintiff's property claim and condition of the business of Best Body Shop. Asserts attorney-client privilege.] This document falls under the attorney-client privilege for the same reason as document no. 15.

21 and 22—[Letter from Auto–Owner's to its outside counsel and an Auto–Owners internal memo (copy to outside attorney) regarding Department of Insurance complaint. Asserts attorney-client privilege.] These documents are irrelevant to this case.

23 through 25—[Correspondence between Auto–Owners and its outside attorney and a claims authorization regarding status of contract seller. Asserts attorney-client privilege and work product immunity.] These documents are irrelevant to the plaintiff's claim and fall under the attorney-client privilege in a separate, though related, matter.

29 through 31—[Correspondence and newspaper article regarding City's activity regarding the plaintiff's property. Asserts attorney-client privilege and work product immunity.] These documents are irrelevant to the plaintiff's case.

32—[Correspondence to Auto–Owners from its outside attorney on the status of the Small Business Administration's Proof of Loss. Asserts attorney-client privilege.] These documents fall under the attorney-client privilege, being mental impressions and legal advice of Auto–Owners' attorney.

33—[Correspondence to Auto–Owners from its outside counsel regarding contract seller's inquiries into property rights. Asserts attorney-client privilege.] This document is privileged attorney-client communication and is irrelevant to the plaintiff's claim.

34—[3 parts: 1) correspondence to Auto–Owners from its outside counsel regarding transfer of contract seller's interest in property, 2) copy of correspondence to Auto–Owners' outside counsel from contract seller's counsel regarding interest in property, 3) copy of warranty deed from contract seller to the plaintiff. Asserts attorney-client privilege.] 1) This document constitutes privileged attorney-client communication, containing the mental impressions and legal advice of Auto–Owners' attorney. 2) This document is not a privileged attorney-client communication as it was not prepared or sent to solicit or give legal advice, and was not sent to a party's attorney or his subordinate. The document, however, is irrelevant to the plaintiff's case. 3) This document does not fall under the attorney-client privilege as it is not a communication for the purpose of obtaining or giving legal advice. It is, however, irrelevant to the plaintiff's claim.

35—[3 parts: 1) correspondence to Auto–Owners from its outside counsel regarding demand letter from the plaintiff's attorney; 2) copy of demand letter to Auto–Owners' outside counsel from the plaintiff's attorney. Asserts attorney-client privilege; 3) correspondence to S.B.A. from Auto–Owners' outside counsel transmitting blank proof of loss form. Asserts attorney-client privilege] 1) Protected from disclosure by the attorney-client privilege as it communicates Auto–Owners' attorney's mental impressions and legal advice. 2) the plaintiff's own communication. 3) Not an attorney-client privileged communication as it was not sent to a party with a representative relationship (an "outsider") and was not prepared to solicit or give legal advice. However, irrelevant to the plaintiff's claim.

36—[Correspondence to Auto–Owners from its outside counsel regarding the attached S.B.A. proof of loss statement. Asserts attorney-client privilege.] The correspondence constitutes privileged communication. The attached proof of loss statement is irrelevant to the plaintiff's claim.

37—[Correspondence to Auto–Owners from its outside counsel regarding status of S.B.A. Asserts attorney-client privilege.] This document contains the mental impressions and legal advice of Auto–Owners' counsel and thus consti-

tutes privileged communications. It is also irrelevant to the plaintiff's claim.

38—[Memo to Auto–Owners' branch office from its home office regarding denial of S.B.A.'s claim. Asserts attorney-client privilege.] Because of the date of this correspondence (October 2, 1987), the message, and the context, this document constitutes work product and attorney-client material as to all parties.

41—[Correspondence to Auto–Owners from its outside counsel acknowledging receipt of the plaintiff's case. Asserts attorney-client privilege.] This document falls under the attorney-client privilege and is irrelevant to the plaintiff's claim.

49—[Auto–Owners' internal memorandum directing request for information on status of S.B.A. from its outside counsel. Asserts work product immunity.] This document constitutes work product and privileged attorney-client communication.

50—[Communication to Auto–Owners from its outside counsel regarding request of the plaintiff's attorney for information, and attached letter from the plaintiff's attorney. Asserts attorney-client privilege.] The letter from Auto–Owners' outside counsel contains his mental impressions and legal advice and thus constitutes privileged information. The attached letter is the plaintiff's attorney's own letter.

61—[Communication to Auto–Owners from its outside counsel regarding settlement with contract seller. Asserts attorney-client privilege.] This document is irrelevant to the plaintiff's claim.

62—[Correspondence to Auto–Owners from its outside counsel regarding sewer bills and transfer of property. Asserts attorney-client privilege.] This documents falls under the attorney client privilege as it contains the mental impressions and legal advice of Auto–Owners' counsel. It is also irrelevant to the plaintiff's claim.

63—[Correspondence to Auto–Owners from its outside counsel regarding status of the S.B.A. and attached letter from Auto–Owners' outside counsel to the S.B.A. regarding its status. Asserts attorney-client privilege.] The correspondence to Auto–Owners contains the mental impressions and legal advice of its counsel and is a privileged attorney-client communication. The copy of the letter to the S.B.A. is not a privileged attorney-client communication as it is not between attorney and client and was not sent to solicit or give legal advice. Both documents, however, are irrelevant to the plaintiff's claim.

The following documents shall be produced within ten days of receipt of this order with the noted redactions:

46—[Auto–Owners' internal memorandum regarding details of fire and loss. Asserts work product immunity.] This document was prepared in the ordinary and regular course of the business of claim evaluation. The section on the reserve established shall be redacted.

48—[Auto–Owners' contact record which logs activity regarding the plaintiff's claim. Asserts attorney-client privilege.] This is a routine and ordinary business document, not prepared for the purpose of litigation. The entries after (not including) April 3, 1987 shall be redacted as protected work product.

SO ORDERED.